David GILLINGHAM and Debra Gillingham, his wife, Appellees, No. 968 WDA 2011

v.

CONSOL ENERGY, INC., Appellant.

Clifford Decker and Pamela A. Decker, Appellees, No. 969 WDA 2011

v.

Consol Energy, Inc., Appellant.

Superior Court of Pennsylvania.

Argued Feb. 14, 2012.
Filed June 27, 2012.
Reargument Denied Sept. 5, 2012.

Rodger L. Puz, Pittsburgh, for appellant.

Timothy Conboy, Pittsburgh, for Gillingham, appellees.

John W. Brown, Pittsburgh, for Decker, appellees.

BEFORE: BOWES, OLSON, and PLATT,* JJ.

OPINION BY BOWES, J.:

In these consolidated appeals, Consol Energy, Inc., ("Consol") raises challenges to various rulings made during the course of this personal injury action as well as to the jury award in favor of Appellees herein, David and Debra Gillingham and Clifford and Pamela Decker. We affirm.

We set forth a brief factual and procedural recitation before addressing the issues raised in this appeal. On June 12, 2007, Mr. Gillingham and Mr. Decker were working at Building No. 19 at the Consol facility in South Park, Pennsylvania, when they exited the second floor of the concrete building by using an exterior metal stairway. As they started to descend, the steps separated from the building due to the disintegration of rusty bolts that secured the staircase to the structure. The two men fell thirteen feet and sustained bodily injuries that we outline in more detail, *infra.*

The Deckers and Gillinghams instituted separate civil actions against Consol to recover damages caused by the injuries suffered by the two men. The two actions were consolidated for purposes of trial. The jury awarded Mr. Gillingham $1,877,000, Mrs. Gillingham $923,000, Mr. Decker $4,543,000, and Mrs. Decker

* Retired Senior Judge assigned to the Superior Court.

$457,000. Consol filed a motion for post-trial relief, the motion was denied, and these appeals followed entry of judgment on the verdict.

Consol raises these issues for our consideration:

A. Whether Consol is entitled to the entry of remittitur or, in the alternative, a new trial on the issue of damages, because the damages awarded by the jury are plainly exorbitant, excessive and beyond what the evidence warranted?

B. Whether Consol is entitled to a new trial because the trial court erred in permitting Mr. Decker's employer and economic expert to testify based upon speculation and contrary to the facts?

C. Whether Consol is entitled to a new trial because the trial court erred in allowing testimony relating to Mr. Gillingham's claim for lost wages, lost future earnings and earning capacity?

D. Whether Consol is entitled to a new trial because the trial court erred in submitting a jury verdict form for completion by the jury which included 12 separate line items for damages, many of which had no evidentiary support?

E. Whether Consol is entitled to Judgment N.O.V. or, in the alternative, a new trial because the trial court erred in denying Consol's motion *in limine* relating to liability expert witnesses and testimony and overruled Consol's objections to speculative testimony?

F. Whether Consol is entitled to Judgment N.O.V. or, in the alternative, a new trial because David Gillingham executed a valid release and waiver of liability?

G. Whether Consol is entitled to Judgment N.O.V., or, in the alternative, a new trial, because the evidence at trial established that Plaintiff David Gillingham was Consol's "Borrowed Servant"?

H. Whether Consol is entitled to a new trial because the trial court erred in refusing Consol's requested instructions 19, 27 and 28 where said instructions were a correct statement of the law and were not otherwise covered in the court's charge to the jury?

Appellant's brief at 6–7.

■ Issue E relates to whether Consol is entitled to judgment notwithstanding the verdict ("NOV") as to liability. If Consol prevails in this connection, the need to address the remaining issues would be obviated. Issues F and G pertain to different bases for judgment NOV with respect to Mr. Gillingham. If Consol's arguments regarding judgment NOV as to that plaintiff were meritorious, issue C would be rendered moot. Finally, issue H would result in a new trial as to both liability and damages rather than merely damages. Hence, we will first address issue E, followed by F, G, and H. We will then return to resolve all contentions concerning damages.

Our standard of review of a trial court's denial of a motion for judgment notwithstanding the verdict is whether there was sufficient competent evidence to sustain the verdict. Judgment notwithstanding the verdict will be entered only in a clear case where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. An Appellate court will reverse a trial court ruling only if it finds an abuse of discretion or an error of law that controlled the outcome of the case.

*Portside Investors, L.P. v. Northern Insurance Co. of New York,* 41 A.3d 1, 8 (Pa.Super.2011) (quoting *Antz v. GAF Materials Corp.,* 719 A.2d 758, 760 (Pa.Super.1998)).

■■■ Consol claims entitlement to judgment NOV as to all plaintiffs based on the fact that Appellees' expert witness allegedly presented testimony that was speculative. Specifically, Consol maintains that Appellees "theorized that there was some sort of 'rework' to the upper bolts. However, there was no proof to support that theory." Consol's brief at 41.[1] The law provides that

> expert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence. Accordingly, the Pennsylvania Rules of Evidence prescribe a threshold for admission of expert testimony dependent upon the extent to which the expert's opinion is based on facts and data:
>
> Rule 703. Bases of opinion testimony by experts
>
> > The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703.

*Helpin v. Trustees of University of Pennsylvania,* 969 A.2d 601, 617 (Pa.Super.2009) (citation and quotation marks omitted).

After careful review, we conclude that the expert testimony proffered by Appellees did not lack a foundational basis. In this case, Appellees premised liability against Consol upon allegations that it failed to maintain, inspect, and repair the stairwell and that the structure collapsed after the bolts securing it to the building disintegrated due to rust. Based both upon an actual inspection of the staircase components and building as well as pictures, Appellees' expert witnesses were able to opine to a reasonable degree of certainty that the bolts holding the stairwell to the building were corroded, the corrosion caused those bolts to fail, there was visible rust on part of the mechanism that secured the staircase, and Consol failed to exercise reasonable care because it did not discover the corrosion.

■■■ We now outline the basis for Consol's liability herein. Messrs. Gillingham and Decker were on Consol's property to perform services for Consol. Thus, they were invitees as defined by Restatement (Second) of Torts § 332, which is utilized by this Court to determine the status of a plaintiff. *See Gutteridge v. A.P. Green Services, Inc.,* 804 A.2d 643 (Pa.Super.2002). Restatement § 332 provides:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public.

---

1. While Appellees urge a finding of waiver of this objection, we conclude that it was adequately preserved by presentation of a motion *in limine* and numerous objections at trial that the expert witnesses' opinions were speculative.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

Restatement (Second) of Torts § 332; *see Rudy v. A–Best Products Co.*, 870 A.2d 330, 333 n. 3 (Pa.Super.2005) ("It is undisputed that as an employee of an independent contractor, [plaintiff] was a business invitee at the [defendant's] site.").

■ The duty that a possessor of land owes to an invitee is "the highest duty owed to any entrant upon land." *Gutteridge v. A.P. Green Services, Inc.*, *supra* at 656. "The landowner must protect an invitee not only against known dangers, but also against those which might be discovered with reasonable care." *Id.* The duty a possessor of land owes to invitees is as follows:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Id.;* Restatement (Second) of Torts § 343.

Appellees presented expert witness Philip Hundley, an architect for forty-four years, on the question of liability. He reviewed photographs taken during the site inspection, a report from engineer Dr. Behzad Kasraie, and a report from technical engineering consultant John Frank. Mr. Hundley testified as follows. The Consol building was constructed of concrete, which is very porous and absorbs water into its interior where it cannot be dissipated by sun and wind. N.T. Trial, 11/15/10, at 304. Rust is also a concern with respect to buildings in that "rust is really the first step of the deteriorating metal or any other structure contacted with that." *Id.* at 312–13. There are two types of rust: surface rust, which "would not affect the integrity of the structure," *id.* at 315, as well as corrosive rust that begins to destroy the fabric of the metal. When metal supports columns or a stairway, caution dictates that the building owner control that substance to prevent deterioration of the metal. *Id.* at 313. Once metal displays any type of rust, it is a warning sign that the owner "would need to clean the metal, whatever the problem was, refinish it, making sure you got all the rust off. If you find rust in one place, you need to make sure you investigate and rule out if you have any hidden rust conditions." *Id.* at 315–16.

Mr. Hundley noted that the stairwell in question herein was secured to the building by four bolts. The upper two bolts were load-bearing that took the stress from the stairs, while the bottom two braced the structure and aided in support. Mr. Hundley continued, "When I use the term bolts, these are actually studs that have threads on them, that have really nuts and washers on either end." *Id.* at 313. Since the bolts supported the stairwell, "if the bolts disappear, the stair collapses immediately because nothing is holding the stair in the air. Therefore, it is critical that those bolts and/or nuts be maintained." *Id.* at 313–14.

The bolts were secured by a metal plate located inside the building, which is called a backing plate. The inside backing plate for the staircase in question had rust along the side and bottom. Mr. Hundley stated

that the rust visible on the backing plate was an indication that there were additional problems on the inside bolts that should have been inspected. *Id.* at 324. Mr. Hundley also indicated that there was rust on the outside bolts that would have been evidence that the portion of the bolts inside the building may have been rusted. *Id.* at 333. He related that the presence of rust triggered a responsibility to further investigate the structural integrity of the bolts.

Mr. Hundley confirmed that the stairway collapsed due to "rust, corrosion of the bolts holding it up" and that an inspection of the backing plate and outside bolts would have alerted Consol to the problem. *Id.* If Mr. Hundley had viewed the outside rust on the bolts and on the backing plate, he would have obtained a structural engineer and removed the bolts to determine their condition. *Id.* at 338.

Appellees also presented Dr. Kasraie, an engineer, as a witness. He actually inspected the nuts, bolts, and plates involved in the June 12, 2007 stair collapse, took numerous photographs of those materials, and performed testing. He confirmed that the stairwell was supported by the top two bolts and that the stairwell collapsed because "the bolts failed because they were rusted, they were corroded. There was really nothing left. They were just hanging by a thread[.]" *Id.* at 478. He substantiated that the inside backing plate displayed signs of rust. Dr. Kasraie continued that rust is a concern to an engineer because "rust is really what kills the metal. Any time you design something, we worry about the rust." *Id.* at 483. He stated that "corrosion is a sign of trouble and triggers a duty to investigate." *Id.* at 483–84.

Dr. Kasraie also observed, through visual inspection of the bolts themselves and as evidenced from photographs of those items, the following:

[W]e noticed that the top two rods that are larger, they had a big huge, you know, hammering mark at the end of it, lead to the point you couldn't really take the nut out. You could see the hammer mark.

So that indicated to us that somebody basically drove that thing in with a hammer. And possibly the hole wasn't large enough, or it got stuck somewhere or something, but the hammering mark indicates an unprofessional installation. You are not supposed to be doing that, but that's what we observed.

Q. When that was hammered—do the hammer marks appear on Figure 11 up there?

A. Yes.

Q. Were the hammer marks on the inside of the upper bolt?

A. They were from the inside.

Q. Now, what does that indicate to you then, if both of the upper bolts have hammer marks on them?

A. I just said that. It looks like it wasn't going in, and somebody had to force it in.

Q. Would you be able to tell the jury and show them why they are deformed, why those, the ends of that bolt are deformed.

Can you tell them that, show them.

A. Because they were beaten up by a hammer, you know. We have samples to show and pictures.

*Id.* at 492–93.

The witness continued that one of the bolts that he visually observed was deformed and bent and that it would not have bent due to the stair collapse. The only explanation for the bent bolt was that it was hammered into the wall. *Id.* at 494–95. Based on his review of the photo-

graphs, visual inspection, and testing of the materials, he concluded that there was some "sort of rework after the initial installation." *Id.* at 500.

■ Thus, as is readily evidenced by the record, Dr. Kasraie's opinion about reworking was not to any extent based upon speculation. Rather, Dr. Kasraie premised his conclusion that the bolts were reworked on a visual inspection of the items in question and the existence of hammer marks on them. This case bears no resemblance to that relied upon by Consol. *Collins v. Hand,* 431 Pa. 378, 246 A.2d 398 (1968) (expert made unsupported assumptions about the manner in which a medical procedure was conducted). Furthermore, as is readily apparent from a review of the testimony of the expert witnesses, liability against Consol was not premised upon the fact that the bolts were hammered into the building; rather, Consol was subject to liability in this action due to its failure to inspect the building and recognize that the visible rust on the outside of the bolts and backing plate meant that the structural integrity of the interior bolts that supported the stairwell may have been compromised by rust and corrosion. Hence, we reject Consol's request for judgment NOV as to all plaintiffs.

■ We now address Consol's contention that it should have been granted judgment NOV as to Mr. Gillingham since he executed a release. The trial court submitted the issue of the release's validity to the jury due to Mr. Gillingham's assertion that the release was a contract of adhesion. Exculpatory documents releasing a party in advance for that party's own negligence are not favored in Pennsylvania and are strictly construed. *Nissley v. Candytown Motorcycle Club, Inc.,* 913 A.2d 887, 890 (Pa.Super.2006) (citing *Employers Liability Assurance Corp. v. Greenville Business Men's Association,*

423 Pa. 288, 224 A.2d 620 (1966)). "It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion." *Chepkevich v. Hidden Valley Resort, L.P.,* 607 Pa. 1, 2 A.3d 1174, 1189 (2010); *accord Employers Liability Assurance Corp., supra.* As noted in the Summary of Pennsylvania Jurisprudence, "The conditions allowing an exculpation agreement to be valid include each party being a free bargaining agent. Courts refuse to enforce releases from liability, when the agreement does not reflect the free choice of one party who is forced to accept the releases by the necessities of his or her situation. Thus, for example, an exculpatory clause in a contract of adhesion is not valid." Pa. Jur. Commercial § 4:70 (footnotes omitted).

For example, in *Soxman v. Goodge,* 372 Pa.Super. 343, 539 A.2d 826 (1988), we invalidated releases executed by a patient and her husband as a condition for receiving medical records. We concluded that the releases were infirm because they "violated public policy and were not the result of a freely bargained for exchange" and instead, were a product of the disparate bargaining positions of the parties. *Id.* at 828. We noted that Pennsylvania jurisprudence was antagonistic to a blanket exculpation of liability and that our courts refuse "to enforce such releases when the agreement does not reflect the free choice of one party who is forced to accept the releases by the necessities of his or her situation." *Id.*

In this case, Mr. Gillingham argues that the trial court's decision to submit the issue to the jury was proper under the

authority of *Leibowitz v. H.A. Winston Co.*, 342 Pa.Super. 456, 493 A.2d 111 (1985). Therein, an employee was asked by his employer to take a lie detector test, which he felt compelled to undergo, about money that was missing from the employer's safe. When he arrived for questioning, the polygraph administrator gave the employee a document to execute and told him that he had to sign it in order to take the test. The instrument in question apprised the employee that he could not be required to take the polygraph examination as a condition of his continued employment, stated that the worker was not pressured into undergoing the questioning, and contained a release of any liability as to the employer and the agency that administered the test in connection with its administration.

The worker acknowledged that he quickly reviewed the document but stated that he did not understand it. After he failed the test, he protested that it was incorrect and that he had not taken the money. The employee then underwent and passed a polygraph given by another agency. After he was terminated, the employee sued both his employer and the polygraph administrator under various theories of liability. The case proceeded to trial, where the trial court entered a nonsuit in favor of both defendants at trial based upon the plaintiff's execution of the release. On appeal, we reversed.

We noted it is against the public policy of Pennsylvania to require an employee to undergo a polygraph as a condition of employment. The trial court concluded that the release of the two defendants was valid unless the plaintiff showed that the releases were required as a condition of employment, and that any testimony to that effect was merely based upon the subjective belief of the plaintiff rather than express statements by either defendant. We ruled

that the trial court should have submitted to the jury the issue of whether the plaintiff signed the release and took the test "under a compulsion consisting of fear of losing his job if he refused." *Id.* at 113. We noted that if there is a disparity of bargaining power between the plaintiff and defendant, exculpatory agreements can be invalidated on the ground that the plaintiff's entry into the accord did not represent a free choice by the plaintiff but was the result of economic necessity.

Applying that law to the case at hand, we conclude that the trial court did not err in submitting the issue to the jury for resolution. Mr. Gillingham's testimony was sufficient to present a genuine issue of material fact as to whether the release was a contract of adhesion. Mr. Gillingham was an electrical engineer who specialized in microelectronics. He designed electronic circuits for computer programs and wrote software for automation designed to coordinate the equipment in a plant. In 2001, Mr. Gillingham started his own consulting business called Drayham Automation. In 2006, he was contacted by Technical Solutions and asked to work on a project as its employee. The project base was Consol Energy, South Park, and involved the following. Doug Farnham, who owned Farnham & Pfile Construction Company, had acquired technology to generate power from waste coal. Mr. Farnham was attempting to sell that technology to Consol, which leased buildings on its South Park property so that Farnham could demonstrate the technology before Consol decided whether to purchase it.

The project ran into difficulties with electrical controls and the software development was behind schedule. Technical Solutions hired Mr. Gillingham to solve those problems. Mr. Gillingham's involvement was scheduled to last three months, and Technical Solutions hired him for a

36.5 hour work week. He started working full-time on the project in March 2006. A couple of weeks after he started, he was called into the Consol offices and asked to sign some documents. Mr. Gillingham testified that Consol indicated that he "needed to sign ... a non-compete agreement." N.T. Jury Trial, 11/18/10, at 1103. The witness explained that occasionally, when he went to a customer site, the client would have proprietary technology and the client would ask him to sign a statement indicating that he would not share the technology with another company.

When Mr. Gillingham arrived at the office, Consol presented him "with a stack of documents" containing several hundred pages and informed Mr. Gillingham that he "had to sign those." *Id.* The places where he had to execute his name were marked with stickers. Mr. Gillingham was never informed that he was assenting to a waiver of his right to sue Consol in the event he was injured due to its negligence. He felt that he had to sign the pages in question since he was contractually obligated to provide his services on the project through Technical Solutions. Mr. Gillingham believed that he was not in a position to refuse to sign the documents presented to him by Consol, and he stated, "If I would have not signed them, I would have to leave the site ... because it's like saying, No, I'm not going to honor your agreement and protect this technology." *Id.* at 1105. He also would have violated his contract with Technical Solutions.

This proof was sufficient to present a question of fact as to whether Mr. Gillingham, who was under contract to provide services on the project, was compelled to execute the documents due to Consol's superior bargaining position. Mr. Gillingham's testimony was sufficient to support a finding that the release was a contract of adhesion and that Mr. Gillingham was not

a free bargaining agent in the matter. Hence, the trial court did not err in submitting the question of the release's validity to the jury, and the jury's verdict on the matter was based upon sufficient evidence.

On appeal, Consol attempts to impugn the veracity of Mr. Gillingham's testimony by noting that he never produced the hundreds of pages of documents. However, this position is disingenuous since Consol, not Mr. Gillingham, retained those items, as is evidenced by the fact that it produced the signed release at trial. Mr. Gillingham's contractual obligation to Technical Solutions and subjective belief that he would have had to leave the work site if he did not sign the papers that Consol presented to him were sufficient for this matter to fall within the parameters of the *Liebowitz* decision.

■ Consol also claims that it is entitled to judgment NOV as to Mr. Gillingham because it is immune from his suit under the Pennsylvania Workers' Compensation Act. 77 P.S. § 481(a) ("The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death[.]").

Herein, Mr. Gillingham admittedly was on the payroll as an employee of Technical Solutions, which paid workers' compensation on his behalf. Furthermore, the contract between Consol and Technical Solutions expressly stated that Mr. Gillingham's relationship with Consol was that of an independent contractor and that he was an employee of Technical Solutions. The fact that Mr. Gillingham was not Consol's employee is further evidenced by the fact that it had him sign a release, which would have been unneces-

sary if Consol enjoyed immunity from suit under the Workers' Compensation Act. Finally, Mr. Gillingham was working on the development of a software program and Consol neither directed that enterprise nor told him how to solve the software issues that it was experiencing.

Thus, while Mr. Gillingham worked at its site, Consol management did not dictate how Mr. Gillingham was to troubleshoot the situation nor did Consol give him the tools to perform that service. Mr. Gillingham specifically testified at trial that no one from Consol told him the manner in which to perform his job since none of its employees had expertise in software development. N.T. Jury Trial, 11/18/10, at 1008. Consol did not provide the computers that he was using to write the software for the control systems. *Id.* at 1009. When Mr. Gillingham required a day off from work, he directed that request to Technical Solutions.

▇▇▇▇ Given these facts, we conclude that the trial court did not err in submitting the issue of whether Mr. Gillingham was Consol's employee under the Workers' Compensation Act to the jury. *Patton v. Worthington Associates, Inc.,* 2012 PA Super 74, 43 A.3d 479 (Pa.Super.2012). The statutory-employer immunity defense, which Consol seeks to invoke herein, arises pursuant to 77 P.S. § 52 of the Workers' Compensation Act. That section, which is entitled "Employers' Liability to Employee of Employee or Contractor Permitted to Enter Upon Premises," provides, "An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employee or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employee or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own

employee." An employer "is declared to be synonymous with master" and includes corporations, 77 P.S. 21, while an employee is "declared to be synonymous with servant." 77 P.S. § 22. Finally, 77 P.S. § 25 states that the term *contractor* "shall not include a contractor engaged in an independent business, other than that of supplying laborers or assistants, in which he serves persons other than the employer in whose service the injury occurs[.]" We use the following test to determine if a person is a servant:

"In ascertaining the character of the relationship, the basic inquiry is whether the alleged servant is subject to the alleged master's control or right to control." *Knepper v. Curfman,* 158 Pa.Super. 287, 44 A.2d 852, 853–854 (1945). "A master is one who stands to another in such a relation that he not only controls the results of the work of that other, but also may direct the manner in which such work shall be done." *Joseph v. United Workers Ass'n,* 343 Pa. 636, 23 A.2d 470, 472 (1942). "A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter." *Id.*

It is essential to the relation of employer and employee that the employer shall have power and authority to direct and control the acts of the alleged employee. Having this power the employer must respond; lacking it he is not to be held accountable. Respondeat superior is the foundation of liability; and if the employer or principal is without power to command or direct the acts of the alleged employee or agent, there is no superior whose duty it is to respond for the acts of an inferior. **Where a contract is let for**

**work to be done by another in which the contractee reserves no control over the means of its accomplishment but merely as to the result, the employment is an independent one establishing the relation of contractee and contractor and not that of master and servant.** The relation of master and servant is not inferable from the reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative, so long as he does it in accordance with the contract. The very phrase 'independent contractor' implies that the contractor is independent in the manner of doing the work contracted for.

*Joseph, supra* at 472. "Broadly stated, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor.... It is not ... the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor." *Weatherly Area Sch. Dist. v. Whitewater Challengers, Inc.*, 532 Pa. 504, 616 A.2d 620, 622 (1992).

*Id.* at 484–85 (emphasis in original).

 We noted in *Patton, supra* that, "A statutory employer is a master who is not a contractual or common-law one, but is made one by the Act." *Id.* at 485; *McDonald v. Levinson Steel Co.*, 302 Pa. 287, 153 A. 424, 425 (1930). Before a defendant will be considered a statutory employer under § 52, the following five elements must be present: "(1) An employer who is under contract with an owner or one in the position of an owner. (2) Premises occupied by or under the control of such employer. (3) A subcontract made by such employer. (4) Part of the employ-

er's regular business entrusted to such subcontractor. (5) An employee of such subcontractor." *Patton, supra* at 486. "[I]n order to satisfy the *McDonald* test[,] a master-servant relationship must exist. Further, because an independent contractor can never be a statutory employee, the elements of the *McDonald* test cannot be met where a 'contractor' is an independent contractor." *Id.* (citations and emphasis omitted). We concluded in *Patton* that the issue was properly submitted to the jury in that case based on the language in the contract between the plaintiff and defendant and the factual circumstances of the job site.

In this case, the contract between Mr. Gillingham and Technical Solutions as well as the one between Technical Solutions and Consol clearly designated Mr. Gillingham as an independent contractor of Consol. Consol is not in the business of providing software solutions. Finally, Consol did not remove Mr. Gillingham's ability to choose the means and methods of completing his work. Under the authority of *Patton*, these facts rendered sound the trial court's decision to submit this question to the jury, and Consol is not entitled to judgment NOV based upon the fact that it is statutorily immune from suit under § 52 of the Workers' Compensation Act. *Id.* at 489 (citation omitted) ("Only when the independence of a contractor is so completely taken away as to make his selection of the means and methods of carrying out his work subject to his employer's will does he become a mere employee or agent.").

 We now address Consol's request for a new trial as to liability because the trial court erred in refusing several requested points for charge.

Our standard of review when considering the adequacy of jury instructions in a civil case is to determine whether the trial court committed a clear abuse

of discretion or error of law controlling the outcome of the case. It is only when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue that error in a charge will be found to be a sufficient basis for the award of a new trial.

*Pringle v. Rapaport*, 980 A.2d 159, 165 (Pa.Super.2009) (citations and quotation marks omitted). "A trial court must instruct the jury on the correct legal principles applicable to the facts presented at trial. A trial court has wide latitude choosing the precise language of the charge, but in all instances must fully and adequately convey the applicable law to the jury." *Gaudio v. Ford Motor Co.*, 976 A.2d 524, 550 (Pa.Super.2009) (citations omitted).

▆▆▆ In this case, Consol avers these proposed points for charge were improperly denied:

19. You are instructed that an expert cannot be permitted to **guess** or to state an opinion based on mere **conjecture**. You are further instructed that the opinion of an expert does not constitute proof of the existence of the facts necessary to support the opinion.

27. The purpose of awarding damages in cases involving personal injuries is to be compensatory and compensatory only. Thus, the purpose in awarding damages is neither to punish the defendant nor to make the injured party wealthy, nor to provide the injured party with a windfall. This is to say that the plaintiffs should be compensated for the damages they proved. However, the Plaintiffs should not be placed in a better position than they were before the damages occurred. You are instructed only to award damages as you will be necessary to make the Plaintiffs whole and no more.

28. Damages are not presumed under the laws of Pennsylvania. Therefore, the plaintiffs have the duty and the burden to prove their damages with reasonable precision and certainty they claimed to have sustained. In other words, it is the plaintiffs' burden to establish the nature and extent of their damages and damages must not be based on **guess** or **speculation.**

Consol's brief at 62 (emphases in original, citations omitted).

After review of the jury instructions, we conclude that all three concepts in question were adequately conveyed to the jury. *See* N.T. Jury Trial Vol. 5, 11/22/10, at 1678–79 ("you are not bound by an expert's opinion merely because he is an expert.... In general, the opinion of an expert has value only when you accept the facts upon which it is based."); *Id.* at 1682 (You are to award money damages that will "fairly and adequately compensate the Plaintiff for all the physical and financial injury he has sustained[.]"); *Id.* at 1682–92 (discussion of damages in general, what can be awarded, and what plaintiff must establish). Hence, a new trial is not warranted on this basis.

▆▆▆ Now, we consider Consol's position that it is entitled to *remittitur.*

We review a trial court order denying *remitittur* for an abuse of discretion or an error of law. *Tindall v. Friedman*, 970 A.2d 1159, 1176 (Pa.Super.2009). We will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. *Id.* Large verdicts are not necessarily excessive verdicts; each case is unique and dependent on its own special circumstances. *Id.* In awarding damages for past or future non-economic loss, a jury may consider, *inter alia*, the age of the plaintiff, the severity of his or her injuries, whether

the injuries are temporary or permanent, the duration and nature of medical treatment, the duration and extent of physical pain and mental anguish on the part of the plaintiff, and the plaintiff's physical condition before the injuries. *Hyrcza v. West Penn Allegheny Health System, Inc.*, 978 A.2d 961, 979 (Pa.Super.2009).

As we noted in *Hyrcza,*

Rule 1042.72(b) provides the following guidelines for what is considered to be an "excessive" amount of damages:

A damage award is excessive if it deviates substantially from what could be reasonable compensation. In deciding whether the award deviates substantially from what could be considered reasonable compensation, the court shall consider (1) the evidence supporting the plaintiff's claim; (2) factors that should have been taken into account in making the award; and (3) whether the damage award, when assessed against the evidentiary record, strongly suggests that the trier of fact was influenced by passion or prejudice.

Pa.R.C.P. 1042.72(b). The defendant has the burden of convincing the court that the award deviates substantially from what is considered reasonable compensation. Note to Pa.R.C.P. 1042.72(b).

*Id.*

We first examine the evidence relating to damages adduced by the Gillinghams. Mr. Gillingham, who was forty-nine years old at the time of the accident, testified as follows. After high school, he was a coal miner. While working full-time, he obtained his undergraduate degree in electrical engineering with a specialty in microelectronics from the University of Pittsburgh in 1996. After graduation, he started designing electronic circuits for computer programs, primary parts for industrial controls, and he worked for Mill Equipment Engineering in Pittsburgh. That plaintiff "developed a lot of control circuitry for their particular industry," which was sold to corporations in the steel-processing business. N.T. Trial, 11/18/10, at 978. Additionally, Mr. Gillingham developed software, and in late 1998, he started to write industrial software for automation. He explained that the software would "coordinate all the different equipment in the plant, so that it would work in a coordinated fashion to process the material that they were processing." *Id.* at 981. At that time, he worked primarily for steel mills. Mr. Gillingham was mentored by Iner Stokson, an electric-controls engineer with a large client base.

After four years, Mill Equipment Engineering was sold, and Mr. Gillingham worked briefly for a software engineering company called I2T, where he continued to write industrial software. Once Mr. Stokson died, there was "this huge void," and Mr. Gillingham "was getting a lot of inquiries from these customers that [Mr. Stokson] was doing services for, to help them with some of their controls systems. From time to time, they would have issues, and they would require some type of service." *Id.* at 982.

In 2001, Mr. Gillingham decided to start his own engineering consulting business, Drayham Automation, because the owners of the companies for whom he had worked began to contact him "to do some work in that discipline, whether it be automation or some type of design work for an electrical engineering project." *Id.* at 983. He noted that the controls in, for example, a steel mill, could be very sophisticated and expensive and that he would be asked to perform upgrades or create software. His work required physical activity including

lifting objects that weighed in excess of twenty-five pounds, navigating industrial facilities in order to install and test his work, climbing ladders, and crawling. He had long-term customers for whom he provided services over many years as well as one-time clients.

Mr. Gillingham had about twelve permanent clients, including SSAB, an international steel company based in Sweden with facilities in Japan, North America, Canada, the United States, and Mexico. He spent months in Houston, Texas, where SSAB owns a mill. For that corporation, Mr. Gillingham did "all their process automation. On their lines, they will have HMIs, human machine interfaces. It is specialized computer software that allows the operators to control their aspect of the operation from a computer." *Id.* at 991. Mr. Gillingham delineated that he wrote a lot of software for them, and serviced all of the jobs. On occasion, he manufactured his own hardware drives. He related that there was "a lot of work out there for people like myself. You can work anywhere you want, as often as you want." *Id.* at 996.

With respect to those twelve permanent clients, Mr. Gillingham was "their exclusive controls provider. Essentially, we, you know, form a relationship over the years. I do business with these companies. They trust me, and they don't even—they don't quote this stuff out. They just call me." *Id.* at 992. For a planned project, he had a payment schedule but for emergency situations, he charged $750 a day plus expenses. His material costs generally were ten to fifteen percent of his project income.

Mr. Gillingham was physically fit prior to the accident, jogged about three times a week, lifted free weights, enjoyed leisure activities with his son, and had a busy work schedule. In addition to working for his consulting company, Mr. Gillingham helped care for his mother-in-law, who lived across the street from him and required twenty-four-hour care due to serious heart problems.

As noted, on the day in question, Mr. Gillingham was about thirteen feet from the ground on the second floor when the stairwell collapsed. He thought that he was slipping at first, but then understood he was on the ground and "in a tremendous, tremendous amount of pain ... in so much pain you really can't think about it." *Id.* at 1024. Mr. Gillingham was unable to move and then realized Mr. Decker, who was moaning in excruciating pain, was on top of him. After slowly regaining some motor function, he crawled from under Mr. Decker, stood up, and began to walk in circles due to the overwhelming pain. Soon, other people appeared and Mr. Gillingham felt disoriented, and he wanted to leave the area and go home. He started to pick up his computer, but, unable to do so, became aware that his arm was broken. Mr. Gillingham asked to be taken to the emergency room. There, Mr. Gillingham reported pain "in the upper right extremities and my lower left extremities, because I sustained a lot of trauma to my right arm, and I sustained a lot of trauma to my left leg." *Id.* at 1030.

Mr. Gillingham was discharged from the emergency room, prescribed Vicodin for pain, and told to see an orthopedic doctor. He sustained injuries to his shoulder, spine, left leg, and left foot. The bruising along his left leg remained for three months, and his injury to his Achilles tendon affected his ability to walk for eight to nine months. Two days after the accident, Mr. Gillingham visited Dr. Michael Seel, an orthopedic doctor. By that point, there was stabbing pain in his right shoulder, thoracic region, arm, neck, head, and hip.

An MRI revealed that he had torn the rotator cuff in his right shoulder.

The witness described the pain from the torn rotator cuff; "I would wake up in the middle of the night with excruciating pain.... It would bring tears to your eyes." *Id.* at 1048. He had three surgeries on that area. The first was to repair the torn cuff, the second surgery occurred after he experienced frozen shoulder syndrome, which is when the socket shrinks into the ball of the humerus, and the third surgery transpired after Mr. Gillingham had a second episode of frozen shoulder syndrome. The shoulder problem was also treated with steroids, and Mr. Gillingham was forced to take OxyContin, a powerful pain reliever, for the horrific pain.

In addition to the shoulder injury, Mr. Gillingham suffered a foot injury. He went to West Penn Hospital emergency room on August 7, 2007, after he continued to have "a lot of problems walking." *Id.* at 1045. He saw a podiatrist, who diagnosed and treated a broken sesmoid bone in his left foot. The witness also experienced back pain the day after the accident, treated for months with a chiropractor, and after a spinal MRI and painful nerve conduction tests, was found to have a compression fracture of the spine. By the time of trial, Mr. Gillingham was still treating for shoulder issues, suffered pain in that area, had limited range of motion, and was required to treat with narcotics. He was unable to help with his mother-in-law and to complete a number of household projects, including improvements, that he started before the accident.

Mr. Gillingham specifically established his wage loss. He testified that he tried to return to work after the accident, but eventually had to cease employment with Technical Solutions due to the surgeries. He documented that he lost $105,225 as he was unable to work from August 11, 2009, to the end of March 2010, from the third surgery. Mr. Gillingham testified that he lost two specific projects: 1) an SSAB project worth $300,000, which had a fifty percent profit margin; and 2) a World Class Processing project worth $150,000 with a thirty-five to forty percent profit margin. The plaintiff also stated that he lost business from Key Bellevilles.

Mrs. Gillingham confirmed that after the accident, her husband was unable to aid her with her mother and to complete home improvements that he normally would have been capable of performing. He also can no longer engage in family activities as he did before the fall. Mrs. Gillingham had to nurse her husband through the medical procedures. Significantly, Mrs. Gillingham established that the couple no longer is able to engage in intimate relations:

Q. How has all of this affected your relationship?

A. It's come to like a halt. It's been hard. This has had an impact on our relationship because there's been no real physical contact.

This is hard to talk about and embarrassing, but there just hasn't been any physical relations.

Q. Despite all this, you've stood by David throughout this whole ordeal?

A. Yeah.

Q. What is that?

A. We're partners. They say in good and in bad times when you take your vows. And these are bad times. And I don't believe in walking away.

*Id.* at 1194–95.

The jury's compensatory award to the Gillinghams was as follows:

State the amount of money, if any, you award Mr. Gillingham for each item listed below:

| | |
|---|---|
| Past Medical Expenses | $ 77,000 |
| Future Medical Expenses | $ 100,000 |
| Past Lost Earnings And Past Lost Earning Capacity | $ 100,000 |
| Future Lost Earnings And Future Lost Earning Capacity | $ 300,000 |
| Past Pain And Suffering | $ 500,000 |
| Future Pain And Suffering | $ 500,000 |
| Past Embarrassment And Humiliation | $ 25,000 |
| Future Embarrassment And Humiliation | $ 25,000 |
| Past Loss Of Ability To Enjoy The Pleasures Of Life | $ 50,000 |
| Future Loss Of Ability To Enjoy The Pleasures of Life | $ 100,000 |
| Past Disfigurement | $ 25,000 |
| Future Disfigurement | $ 75,000 |
| TOTAL: | $1,877,000 |

Proceed to Question B.6.

*Question 6.*

State the amount of money, if any, you award to Plaintiff Debra Gillingham for past, present, and future loss of consortium.

*$923,000*

Jury Verdict Form, 11/24/10, at 4–5.

 Consol complains that this award was "inconsistent with the idea of fair compensation to the injured parties" and was "well beyond what the evidence warrants." Consol's brief at 14. Consol levels no complaints about the award for medical expenses, but suggests that the past and future earnings amount was speculative. We disagree. Mr. Gillingham testified quite specifically about wages that he lost from Technical Solutions and also two delineated projects that he could not undertake. We note that it was within the prerogative of the jury to credit this testimony and reject Consol's suggestion that Mr. Gillingham's wage loss was to any extent speculative. *Samuel–Bassett v. Kia Motors America, Inc.,* —— Pa. ——, 34 A.3d 1, 39 (2011) (citation and quotation marks omitted) ("The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses.").

 Consol also assails the award to Mr. Gillingham for past and future pain

by focusing on its ratio to medical expenses. However, under the pertinent law, in this context, we are to review the disparity between the amount of all out-of-pocket expenses, not just medical expenses, and the amount of the verdict. As we noted in *Smalls v. Pittsburgh–Corning Corp.,* 843 A.2d 410 (Pa.Super.2004) (quoting *Stoughton v. Kinzey,* 299 Pa.Super. 499, 445 A.2d 1240, 1242 (1982)):

> In determining whether a jury's award of damages is supported by the evidence, the following factors are taken into account:
>
> 1.) the severity of the injury;
>
> 2.) whether the injury is demonstrated by objective physical evidence or subjective evidence;
>
> 3.) whether the injury is permanent;
>
> 4.) the plaintiff's ability to continue employment;
>
> 5.) disparity between the amount of out of pocket expenses and the amount of the verdict; and
>
> 6.) damages plaintiff requested in his complaint.

*Smalls, supra* at 415.

Mr. Gillingham was severely injured. He underwent three surgeries for a torn rotator cuff and suffered a fractured spine and bone in his foot. His injuries were

demonstrated by objective physical evidence, and the shoulder injury is permanent and continues to affect Mr. Gillingham's ability to work and engage in leisure activities.

As noted, Consol suggests that the pain and suffering and related awards were outrageous given the medical expenses incurred. However, we do not merely look at medical outlays. Rather, out-of-pocket expenses include both lost wages and medical expenses. Thus, Mr. Gillingham's award for pain and suffering and related damages was actually only slightly more than twice the amount of that plaintiff's special damages. Furthermore, Mr. Gillingham comprehensively outlined the severe pain he suffered from falling two flights and landing on a metal stairwell. A full four years after the accident, he continued to treat with narcotic drugs, which he stated that he is loath to use since they affect his cognitive functioning.

The loss of consortium awarded to Mrs. Gillingham cannot be considered excessive or shocking. The couple is no longer able to engage in sexual relations, and Mr. Gillingham cannot perform significant household chores, which included home improvements and aiding with the care of his mother-in-law, both of which are beyond the ordinary chores assumed by a spouse. While Consol complains about the difference between the compensation awarded for Mr. Gillingham's loss of life pleasures, $150,000, and Mrs. Gillingham's award of $923,000, we observe the following. Mrs. Gillingham is able to engage in sexual relations while Mr. Gillingham's pain prevents intimacy. He was compensated in other areas for this loss in the marital relationship, and we do not view the discrepancy as grounds for disturbing the award. We simply cannot agree with Consol's assertion that the verdict in favor of the Gillinghams was excessive, exorbitant, or beyond what the evidence warranted.

We now outline the evidence presented as to the Deckers' damages. Mr. Decker obtained a bachelor of science in biology and did chemistry work with acid mine drainage while earning credits towards his master's degree. He was employed by Hazelton Pumps ("Hazelton"), which sells industrial pumps, as an applications engineer for twenty years. He worked on acid rain drainage systems and water treatment systems. Mr. Decker also took a course in coal preparation at Penn State University because Hazelton sold most of its pumps to that industry. After that course, Mr. Decker started placing pumps in mines for several area companies. After ten years at Hazelton, he was promoted to general manager in charge of its Pittsburgh operations.

When Mr. Decker left Hazelton, he began employment with Toyo Pumps, where he was northeastern manager for that Canadian-based company. For that organization, Mr. Decker placed pumps in mines from Canada to Jamaica. In 2005, after eight years at Toyo Pumps, where he earned $125,000 per year, the witness went to work for Pumpaction, Inc., ("Pumpaction") which supplies and repairs pumps and pumping systems and solids handling systems to various industries. His base salary was $100,000 plus a two percent commission.

Once at Pumpaction, Mr. Decker started serving its customer, PFBC, at Consol's modern power plant, helping with the experimental technology that was an improved way to burn coal. He would gather solids and coal waste materials using pumps in disposal ponds at Consol's facilities and process those items into a usable form. Mr. Decker had to carry heavy buckets and engage in other forms of physical exertion.

Due to the collapse of the stairs, Mr. Decker suffered three fractures to his left femur as well as a bruised knee. He experienced severe pain immediately after the fall, was transported to UPMC Mercy Hospital, and was taken into surgery. When he awoke, his leg felt "[l]ike it was burning off me." N.T. Trial, 11/17/10, at 851. The pain continued to worsen, and at his first attempt at physical therapy, Mr. Decker vomited and fainted. After twelve days in the hospital, the plaintiff was released home in a wheelchair, which he used for four months. His pain continued and he was prescribed powerful narcotics, which caused severe constipation. After four months, Mr. Decker began in-home physical therapy and started to use crutches. The plaintiff had a second surgery, which involved a second recovery a year later, for the removal of the screws placed in his bone during his first surgery.

Mr. Decker's leg suffered nerve damage and his pain was not resolved by the time of trial, even awakening him if he rolls onto his left side while sleeping. Of significance, Mr. Decker cannot use narcotic pain relievers, even though he suffers continual pain, because those drugs cause him disabling constipation that has resulted in hospitalization. Medical testimony indicated that the pain is permanent so that the plaintiff, who was fifty-four when injured, will suffer pain from that condition, which affects his personal and professional life, for his remaining life expectancy.

Mr. Decker worked thirty hours a week in 2009. By the time of trial, he remained unable to work full-time due to pain and doctors' appointments and was restricted from lifting more than thirty pounds and walking on anything other than level ground. The witness stated that due to his leg injuries, "It takes away my ability to go out and fully analyze a job, which is what I used to do." Id. at 871. He cannot earn the commissions that he anticipated earning with Pumpaction. He continued with physical therapy.

Mr. and Mrs. Decker were married for thirty-six years and had three grown sons and one grandchild. Prior to the accident, Mr. Decker was active and engaged in fishing, skiing, golfing, hiking, and skating. He built a cabin in West Virginia. He performed household chores that included walking the dog, gardening, mowing the lawn, shoveling snow, and painting the house. Mr. Decker can no longer engage in any of those leisure activities or aid Mrs. Decker with household tasks.

Based on this testimony, the jury rendered the following award to the Deckers:

State the amount of money, if any, you award Mr. Decker for each item listed below:

| | |
|---|---|
| Past Medical Expenses | $ 124,000 |
| Future Medical Expenses | $ 50,000 |
| Past Lost Earnings And Past Lost Earning Capacity | $ 161,000 |
| Future Lost Earnings And Future Lost Earning Capacity | $ 708,000 |
| Past Pain And Suffering | $2,000,000 |
| Future Pain And Suffering | $ 500,000 |
| Past Embarrassment And Humiliation | $ 200,000 |
| Future Embarrassment And Humiliation | $ 100,000 |
| Past Loss Of Ability To Enjoy The Pleasures Of Life | $ 300,000 |
| Future Loss Of Ability To Enjoy The Pleasures of Life | $ 200,000 |
| Past Disfigurement | $ 100,000 |
| Future Disfigurement | $ 100,000 |
| TOTAL: | $4,543,000 |

Proceed to Question A.4.

*Question 4.*

State the amount of money, if any, you award to Plaintiff Pamela A. Decker for past, present, and future loss of consortium.

$457,000

Jury Verdict Form, 11/24/10, at 1–2.

■ With respect to Mr. Decker, the award of pain and suffering and related damages is only four times the amount of medical expenses, and lost past and future earnings. Furthermore, the award of $2.5 million in past and future pain and suffering must be viewed in light of the fact that Mr. Decker cannot achieve relief from that pain with medication due to complications arising from its use, and that he will suffer from pain for the remainder of his projected 25.5 years on this earth.

■ The loss of consortium award is also supported by the evidence herein. Mrs. Decker fully delineated a plethora of activities that the couple no longer enjoys together and many chores that Mr. Decker cannot perform. As noted, Mr. Decker was not and will not be able to perform any of these actions for 25.5 years, a significant period that supports the amount of the award. *Compare Smalls, supra* (award of $500,000 in loss of consortium was not supported by evidence where spouse was in his seventies and where only injury attributable to tortfeasor was spouse's shortness of breath). The verdict does not shock one's sense of justice, and we cannot overturn the trial court's refusal to award Consol *remittitur.*

■ Consol also contends that it is entitled to a new trial because Mr. Decker's employer and his economic expert witness were permitted to testify about his lost future earnings based on speculation. "Loss of future earnings, if proven, is properly included in a damage award. Obviously, future earnings cannot be calculated with mathematical precision and exactness. The law does not permit a damages award to be based on mere guesswork or speculation, but rather requires a reasonable basis to support such an award." *Helpin v. Trustees of University of Pennsylvania,* 608 Pa. 45, 10 A.3d 267, 270 (2010) (citations omitted). Furthermore, to ensure that a plaintiff is fully compensated for loss future earnings, projected increases in productivity must be taken into account. *Id.; accord Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980). Productivity is gauged by factors that include age, maturity, education, skill, and technology advances. *Helpin, supra; Kaczkowski, supra.* "To determine the effect of productivity factors on lost future earnings, we directed the trial court to adopt an evidentiary approach; *i.e.,* the fact-finder should consider relevant evidence as to productivity factors and then make an informed estimation as to lost future earnings based on all the evidence presented." *Helpin, supra* at 273.

■ Herein, Consol's specific challenge to the evidence regarding Mr. Decker's lost future earnings relates to whether he would have earned commissions at Pumpaction. As noted, Mr. Decker worked for Toyo Pumps for seven years, earning $125,000 per year and took a base pay reduction to $100,000 with a two percent sales commission on pumps. Consol complains that the evidence submitted by Mr. Decker that indicated that he would have earned sales commissions was speculative and should have been excluded by the trial court.

After review of the record, we cannot agree that proof regarding the fact that Mr. Decker would have earned commissions was speculative and conclude that

the lost future earning award was supported by the evidence. Yannick Beaule, Mr. Decker's supervisor at Pumpaction, informed the jury that Mr. Decker was hired because he had worked with Pumpaction while at Toyo Pumps, was very professional, had experience, enjoyed a good reputation in the pumping business, and "was a very, very good salesman." N.T. Trial, 11/16/10, at 598. Pumpaction anticipated that Mr. Decker's base salary would increase to $125,000 once he proved himself and that he would have retained the right to receive two percent commission on sales. *Id.* at 602. Mr. Decker's assigned sales area was the entire United States because he was well-known nationally, especially in the special area of slurry pumps, which involve water containing other materials and are complicated. Pumpaction expected that with his knowledge and experience, Mr. Decker would have generated commissions in the United States. *Id.* at 634. Mr. Decker did not have the opportunity to earn sales commissions immediately after he started with Pumpaction since he began working on the PFBC project, which generated tens of millions of dollars for Pumpaction and had the potential for future sales.

Mr. Beaule substantiated that, after the injuries suffered in the stair collapse, Mr. Decker was unable to work full-time and did not earn his full $100,000 salary in 2007 or thereafter. He was only paid for the hours he was able to actually work and, as outlined *infra,* has not been able to return to work full-time due to his debilitating leg injury. Based upon Mr. Beaule's testimony, Steven Klepper, Ph.D., a Carnegie Mellon University economist, made a projection that Mr. Decker's lost earnings were $1.25 million, which is well in excess of the jury's $708,000 award.

We do not view the proof as to Mr. Decker's future productivity as infirm, taking into account the *Helpin* factors. Mr. Decker had twenty-seven years' experience in selling industrial pumping systems from Canada to the Caribbean, and thus, a vast amount of skill in the field. Additionally, he had many contacts in the pertinent industry from working at Toyo Pumps. He stated that he planned to work until age seventy because he did not have much in retirement savings. There was nothing speculative or uncertain about the proof offered, and the jury verdict was within the range of that established by the evidence. Thus, we reject Consol's challenge.

 Consol additionally levels a complaint as to Mr. Gillingham's award of earnings. Consol suggests that the award cannot be sustained since, "The lost earning and earning capacity 'evidence' offered by Mr. Gillingham was only his own testimony and was not only blatantly self-serving, but pure speculation." Consol's brief at 30. "A plaintiff need only provide the jurors with a reasonable amount of information sufficient to enable them to estimate damages without engaging in speculation." *Detterline v. D'Ambrosio's Dodge, Inc.,* 763 A.2d 935, 941 (Pa.Super.2000) (quoting *Cohen v. Albert Einstein Medical Center,* 405 Pa.Super. 392, 592 A.2d 720, 729 (1991)). Herein, the award of $100,000 to that plaintiff for lost past earnings was fully substantiated by his testimony that he lost $105,225 due to his inability to work from August 11, 2009 to the end of March 2010, after his third surgery. Mr. Gillingham also testified that he lost two specific projects consisting of a SSAB project that would have resulted in a $150,000 profit and a World Class Processing project worth $60,000 in profit. Finally, he substantiated that he lost business from a third client, Key Bellevilles. Mr. Gillingham continued to suffer from unresolved pain that affected his life; hence, the lost future earnings award of $300,000 was well

within the range permitted by this evidence.

■ We note that the jury was apprised of Mr. Gillingham's income as reported on his tax returns. It chose to credit his testimony; we, as noted *supra,* cannot overturn this credibility determination. Also, a plaintiff is not required to present expert testimony on past and lost future earnings in order to sustain a verdict. *Gary v. Mankamyer,* 485 Pa. 525, 403 A.2d 87, 90 (1979) ("It is well established that the fact and the extent of the impairment are jury questions ... and that no expert testimony is required in this jurisdiction to show loss of earning capacity[.]"). A plaintiff can base his proof in that regard on his own testimony. *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674, 696 (1982).

■ The final contention that we address is that the trial court erred in submitting a verdict slip to the jury that contained itemized categories of damages that included past and future disfigurement, loss of life's pleasures, and embarrassment and humiliation. Consol relies upon *Carpinet v. Mitchell,* 853 A.2d 366 (Pa.Super.2004), which supports its position and was decided on May 27, 2004. However, *Carpinet* has since been supplanted by a specific Rule of Civil Procedure, Pa.R.C.P. 223.3, which was adopted August 4, 2004 and made effective December 1, 2004. That rule governs the conduct of the trial for causes of actions for bodily injury or death and specifically outlines the jury instructions on noneconomic loss. It states:

> In any action for bodily injury or death in which a plaintiff has raised a claim for a damage award for noneconomic loss that is viable under applicable substantive law, the court shall give the following instructions to the jury.

> The plaintiff has made a claim for a damage award for past and for future noneconomic loss. There are four items that make up a damage award for noneconomic loss, both past and future: (1) pain and suffering; (2) embarrassment and humiliation; (3) loss of ability to enjoy the pleasures of life; and (4) disfigurement.

Pa.R.C.P. 223.3.

Instructions herein were given in accordance with this provision, and each line item of damages awarded was permitted by that rule. There is no basis to overturn the verdict due to the form of the jury slip. *See McManamon v. Washko,* 906 A.2d 1259 (Pa.Super.2006) (approving line items on a verdict sheet similar to that contained herein). Hence, we reject Consol's reliance upon *Carpinet* and affirm the trial court's decision to submit a verdict slip that conformed to Pa.R.C.P. 223.3.

Judgment affirmed.