IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. Carlinda Purcell,          :
             Appellant    :
                         :   No. 1164 C.D. 2016
           v.           :
                         :   Argued: June 5, 2017
Reading School District   :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE JULIA K. HEARTHWAY, Judge
                 HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION BY
JUDGE McCULLOUGH                    FILED: July 14, 2017

Dr. Carlinda Purcell (Purcell) appeals from a June 21, 2016 order of the Court of Common Pleas of Berks County (trial court), which affirmed an adjudication of the Reading School District (District) terminating Purcell from her position as District Superintendent.

**Facts and Procedural History**

On March 28, 2012, the District appointed Purcell to a five-year term as Superintendent commencing July 1, 2012. (Reproduced Record (R.R.) at 292-300, 835, 858.) That appointment was confirmed in a contract between the District and Purcell dated April 11, 2012. (R.R. at 292-300.) Purcell, however, began her duties as Acting Superintendent after March 28, 2012, on a *per diem* basis. (R.R. at 835.) On February 1, 2013, at the request of the District's School Board (Board), Assistant District Solicitor John Stott sent Purcell a letter about the Board's "concerns with

your performance." (R.R. at 442-43.) Discipline was neither threatened nor mentioned; the letter concluded with "an offer to work together to achieve your goals for the Reading School District." (R.R. at 443.)

On May 20, 2013, Mr. Stott sent Purcell another letter, styled as a "written reprimand," focusing on different concerns from the previous letter, this time homing in on the District's budget process and alleging that Purcell was not complying with Board directives regarding the budget. (R.R. at 444-45.)

On July 3, 2013, Mr. Stott sent Purcell a second letter of reprimand, voicing more concerns about the budget process and suspending her without pay for the period of July 8 through July 12, 2013, with a direction that Purcell meet with the Board Evaluation Committee on July 15, 2013. (R.R. at 446-47.)

Subsequently, the Board sent Purcell and/or her legal counsel "*Loudermill*" letters, that is, written letters notifying Purcell of pending discipline and of her right to appear before the Board and respond, pursuant to the mandate of the United States Supreme Court in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Those letters were dated September 5, 2013 (for a hearing on September 12, 2013), and October 16, 2013 (for a hearing on October 23, 2013). (R.R. at 168, 276-77.)

The letter of November 1, 2013 (for a hearing on November 5, 2013), was not a *Loudermill* notice but rather constituted a Notice of Right to Hearing and Statement of Charges, along with a recommendation to terminate. (R.R. at 160-62.)

After Purcell and her lawyer did not appear for the hearing which had been set for November 5, 2013, the Board continued the hearing to a date not specified in the record, but neither Purcell nor her lawyer was able to attend that rescheduled hearing. The Board denied the request for another continuance, held a hearing on November 19, 2013, and terminated Purcell "on or about November 26, 2013." (Trial court op. at 2.)

2

Purcell appealed to the trial court, which issued an order on April 22, 2014 (entered the following day), holding that the Board improperly denied Purcell's request for a continuance, and remanding to the Board to conduct a new hearing. (R.R. at 163.)

New hearings were convened on August 26, September 11, and October 2, 2014. The three days of hearings were presided over by Attorney Jon Malsnee, a sole practitioner from Wyomissing, who represented the Board, while Mr. Stott represented the District.

Purcell was charged initially under section 508 of the Public School Code, 24 P.S. §5-508,[1] because of allegations that she entered into contracts with the District without a vote of the Board where the amount involved exceeded one hundred dollars. The allegations here were that Purcell authorized two consultants to present at a District retreat. The obligations to the two consultants were subsequently ratified by a Board vote and the consultants were later paid. (R.R. at 45-47, 334-40, 838.) This became Charge 1(a).

Purcell was also charged under section 1080 of the School Code, 24 P.S. §10-1080, on the grounds of neglect of duty, incompetency, and immorality. (R.R. at 838.)

The first of the charges under section 1080 was based on the testimony of former Board member James Washington, who said that the Board told Purcell that three schools within the District needed building principals on a permanent basis before the start of the 2013-14 school year, but that Purcell appointed two District employees to fill two of the vacancies, without Board approval, which is also in violation of section 580 of the School Code. Ultimately, none of the positions were

---

[1] Section 508 of Act of March 10, 1949, P.L. 30, No. 14, *as amended*, 24 P.S. §5-508.

3

filled in a timely manner, according to Mr. Washington. (R.R. at 23-24, 350-53, 839.) This became Charge 1(b).

An additional charge under section 1080 was Purcell's alleged humiliation and embarrassment of the Board during 2013-14 public budget meetings. Specifically, after the Board decided to lay off a number of District employees in an effort to balance the budget, Purcell commented at a public meeting that she was going to find the funding to bring back one of the furloughed employees, the Director of Communications, but said nothing about the other employees. (R.R. at 32, 839.) This became Charge 2.

The Board next charged Purcell with breaching section 13 of her employment agreement. That agreement required Purcell to "promptly file time off and written requests with the Board Secretary for sick leave, vacation and personal leave days. Such records shall remain in the custody of the Board Secretary. The Board President shall be responsible to approved [*sic*] and sign the time off requests." (R.R. at 297.) Board Secretary Linda Greth testified that she never received any such requests from Purcell between July 1, 2012, and July of 2013 despite days taken off by Purcell. (R.R. at 33, 47-48, 50, 354-62, 839-40.) This became Charge 3.

The Board also charged Purcell with failing to meet multiple deadlines concerning the self-evaluation portion of Purcell's overall evaluation. This charge was supported by testimony of former Board member Karen McCree. (R.R. at 14-15.) This became Charge 4.

The next charge alleged that Purcell failed to investigate the conduct of a building principal about whom the Board was concerned was mishandling funds, failing to compensate teachers for individual education plan (IEP) meetings, and failing to submit teacher evaluations to the District's human resources office. In July of 2013, the Board alleged, Purcell finally investigated the allegations, which resulted

4

in the resignation of that principal. (R.R. at 17-18, 363-71, 840.) This became Charge 5.

The Board charged Purcell with error in laying off the assistant director of food service because she was unaware that the food service budget was separate from the general District budget. Purcell's failure here, the Board charged, resulted in an unnecessary layoff in her effort to balance the general District budget. (R.R. at 34-36, 400-06, 840-41.) This became Charge 6.

Purcell was charged by the Board with generally mishandling the budget process in 2013, caused by her lack of understanding of the entire budget process for Pennsylvania public schools. Specifically, the Board faulted Purcell concerning the timing of the budget process imposed by Pennsylvania statutes and regulations, in that Purcell supposedly believed that a school board should get its first preliminary budget in March, with preliminary adoption in May, and final approval of the budget in June. (R.R. at 11, 841-42.) The Board argued that Purcell was or should have been aware that Pennsylvania law requires school districts to exercise an option either to adopt a preliminary budget, including a schedule of proposed tax increases, no later than ninety days prior to the primary election immediately preceding the start of the upcoming fiscal year (which starts July 1 of every year) or to forgo those tax increases. Section 311(a) of the Taxpayer Relief Act,[2] 53 P.S. §6926.311(a). (R.R. at 841-42.)

The Board also contended that Purcell knew or should have known that in lieu of a preliminary budget, school districts have the option of adopting a resolution indicating that any tax increase will not be above the index for that tax, which resolution must be adopted 110 days prior to the same primary election day.

_____

[2] Act of June 27, 2006, P.L. 1873, No. 1 (Spec. Sess. No. 1), *as amended*, 53 P.S. §6926.311(a).

5

Section 311(d) of the Taxpayer Relief Act, 53 P.S. §6926.311(d). (R.R. at 841-42.) That index number is published the prior September. Section 333 of the Taxpayer Relief Act, 53 P.S. §6926.333. (R.R. at 842.) By March, the Board believed that many important budgetary decisions should have been completed. The primary election that year occurred on May 21, 2013. Between 100 and 110 days prior would have been approximately between January 31 and February 10, 2013. Further, the Board charged that Purcell did not know the difference between a "preliminary budget proposal" (which must be passed no later than 90 days prior to that primary election day, or by approximately February 20, 2013, if the District intended to apply for an exception allowing a greater tax increase under Sections 311(a) through (c) of the Taxpayer Relief Act, 53 P.S. §6926.311(a) through (c)) and a "proposed budget" (required to be adopted at least thirty days before the final budget under Section 687 of the Public School Code, 24 P.S. §6-687). At best, the Board concluded in its charge, Purcell was confused about the budget process. (R.R. at 112, 842.)

Next, the Board charged Purcell with an untimely budget that failed to comply with Board directives. Former Board member Washington and current Board member Cooper testified that the budget problems were ongoing and that they conveyed a projected $8 million shortfall. (R.R. at 26-27, 842-43.) They testified that on April 29, 2013, the Board told Purcell it wanted her recommendations about closing the gap in the budget, with significant detail, but that the Board never received the line-item budget it sought. (R.R. at 27.)

Purcell was also charged with failing to provide requested information and materials in advance of a budget workshop held on June 15, 2013. (R.R. at 27, 393-99.)

Next, the Board charged that after a Board budget meeting on June 26, 2013, the Board believed that it was close to a balanced budget, but found on June 28 that it remained far away from a balanced budget, so that the Board ordered Purcell to

6

provide a list of programs and positions which the Board wanted to be eliminated. (R.R. at 25-29, 372-74, 446-47, 842.) According to state law, the budget needed to be balanced that year by June 29, 2013, and the Board did not have a balanced budget by that date. (R.R. at 28, 375-78.)

Finally, the Board charged that it had adopted a resolution that Purcell was to provide a balanced budget by end of day on July 17, 2013, but that Purcell failed to do so until the following August or September. (R.R. at 28-29, 375-78, 400-06, 842-43.)

All of these budget concerns were incorporated into, and became the basis of, Charge 7.

Related to the budget process, the Board charged Purcell with failing to supervise and discipline the Finance Director for misconduct at public meetings. (R.R. at 37-38, 171, 240-42, 301-33, 843.) This became Charge 8.

Purcell was charged by the Board under section 1080 with failing ratings in her job evaluation performed by the Board, (R.R. at 19-22, 407-29, 843.) This became Charge 10.

The Board charged Purcell with seeking reimbursement of mileage after July 1, 2012, and vacation days and car allowance before July 1, 2012, in violation of her employment agreement. (R.R. at 7-8, 10-13, 292-93, 297, 430-40, 843-44.) This became Charge 11.

Finally, the Board charged Purcell with failing to provide an organizational chart the Board had directed her to provide. (R.R. at 30-31, 161, 832-33, 844.) This became Charge 12.[3]

---

[3] The Board did not pursue Charges 9 and 13 during the hearings, the District did not mention these charges in its adjudication, and the trial court did not deal with these charges in its order or its opinion.

Purcell contested all the charges at the three days of hearings. Concerning Charge 1(a), regarding the arrangements with the presenters for a District retreat, Purcell argued that the District had appropriated the funds for the retreat well in advance of the 2013 date. When Purcell contacted the two presenters, she contends that they sent her contracts, which were reviewed and approved by the District's solicitor. She stated that the contracts were placed on the Board's agenda for approval prior to the retreat but the contract approval vote was inadvertently taken off that agenda. The presenters came to the retreat even though their contracts had not been approved. Those contracts were approved later in August, and in September, the contracts were signed and the presenters were paid. (R.R. at 97-98.)

Concerning Charge 1(b), Purcell argued that she had authority under her employment agreement to transfer professional employees, and that she transferred District employees into two of the three vacant principalships in advance of the school year. She argued that the only reason the positions remained vacant was Board interference in the form of the Board's insistence that these transfers could not have been made without Board approval. (R.R. at 99-100, 543-44.) Purcell argued that hiring was subject to Board approval under her employment agreement but transfers were not. (R.R. at 294.)

With regard to Charge 2, Purcell argued that she had an obligation under section 1081 of the School Code, 24 P.S. §10-1081, to speak on all matters before the Board, and that her public statement concerning finding funds for the communications director was justified because Purcell knew that, two days after the communications director's job was eliminated, the District's websites would be shut down for conversion to a new computer platform. According to Purcell, that director was the only person with training to effect the change. (R.R. at 101-02, 143-44.)

Concerning Charge 3, Purcell argued that there was no allegation that she misused her leave time, and that, after she assumed the superintendency, Purcell

became aware that the Board President did not regularly visit the administration building where Purcell had her office, so she asked the Board President if she could e-mail the requests to the Board President, who agreed. (R.R. at 104, 558-64.)

Regarding Charge 4, Purcell argued that her employment agreement did not require any self-evaluation but that when Board member McCree extended the deadline for submission of the self-evaluation materials to August 9, 2013, Purcell submitted them the evening of that date, for an evaluation on August 10. Because there was no duty to provide the materials and because the submission was only minimally late, Purcell argued that there was no neglect of duty.

Concerning Charge 5, Purcell argued that this charge was baseless but, even if true, was too insignificant to constitute neglect of duty. Further, Purcell asserted that any evidence regarding the investigation of the building principal was based upon inadmissible hearsay in the form of after-the-fact e-mail statements by a Board member who did not testify. (R.R. at 18, 106, 565, 567-80.)

Concerning Charge 6, regarding the food service budget and the general budget, Purcell argued that there was no evidence that she knew of the error or misunderstanding regarding the two budgets. Further, she alleged that the position was eliminated by the Board on June 28, 2013, and when a Board member asked Purcell unilaterally to reinstate the furloughed employee, Purcell refused because, first, the Board had eliminated the position by public vote, and, second, the employee was related to a Board member. (R.R. at 35, 109, 393.)

Charge 7 occupied the lion's share of the Board's concerns and so it did for Purcell, who contended that the Board's charges and findings concerning the budget and the budget process were enlarged by the District's solicitor but that the admissible evidence shows that Purcell simply followed the specific directions of the Board between June 28 and July 17, 2013. Once the District learned it was receiving $1 million more than expected from the Commonwealth of Pennsylvania, the budget

9

had to be amended in July. When the District's finance director asked the Pennsylvania Department of Education (PDE) if it wanted the District to submit the June 28 budget, PDE responded that all school districts should wait to submit their budgets until after the budgets were amended to reflect the additional state money. The Board amended its budget, submitted it to PDE, and was not penalized by PDE. (R.R. at 59-60, 121.)

Concerning Charge 8, regarding discipline for the finance director, Purcell argued that there is no evidence of the finance director acting rudely to the Board or the public, and there is a verbatim transcript of the exchange in question. (R.R. at 322-33.) Moreover, there is nothing in the record to support any idea of a "Board directive;" rather, individual Board members questioned the attitude of the finance director, and Purcell stated on the record that she would address the Board's concerns with the finance director. (R.R. at 122, 322.)

Concerning Charge 10, regarding the self-evaluation, Purcell argued that there were performance goals to be established mutually by Purcell and the Board, contrary to section 6 of Purcell's employment agreement. (R.R. at 295-95.) Purcell argued that evaluation forms are not performance goals and that a Board member testified that the Board hired a person to compile a summary evaluation based on the individual submissions, which were not in evidence. Purcell argued that the conclusions in the Board's evaluation are devoid of data. Indeed, one Board member stated in the comment section of the evaluation, "I am not capable of adequately evaluating Dr. Purcell's performance . . . because I have not been provided with performance data . . ." (R.R. at 410.) Section 6 of the employment agreement delineated a specific evaluation procedure, which was not followed at all, concluded Purcell regarding this charge.

Concerning Charge 11, dealing with mileage after July 1, 2012, and vacation days and car allowance before July 1, 2012, Purcell argued that she

submitted her requests to the Board president, who approved the request so that Purcell could be reimbursed. (R.R. at 134, 794.) She was reimbursed for minimal amounts in what, at worst, amounted to a mutual mistake by Purcell and the Board president.

Concerning Charge 12, Purcell argued that there was no "directive" to complete any organizational chart, and that, moreover, the charge was false in that Purcell provided at least five such charts to the Board. (R.R. at 820-33.)

In an adjudication dated November 14, 2014, the District found Purcell guilty of all charges they had pursued at the hearings, and found that this conduct arose to grounds under section 1080 of the School Code which justified termination of Purcell's contract with the District. Accordingly, the District affirmed the Board's firing of Purcell on November 26, 2013.

Purcell appealed to the trial court, which took no additional evidence but which accepted briefs and oral argument. (Trial court op. at 3.) The trial court rejected Purcell's objections regarding due process and affirmed the District's adjudication by order of June 21, 2016. That order was supplemented by an opinion dated September 14, 2016.

On appeal to this Court, Purcell has set forth three arguments: (1) whether "the Superintendent [was] denied due process of law when she was removed from her public office by a school board that acted as complainants, indictors [sic], prosecutors, witnesses and adjudicators of the charges against her. . . ;" (2) whether the trial court erred "by failing to find that the charges against the Superintendent, even if true, do not meet the statutory standard for removal from office set by §1080 of the Public School Code, 24 P.S. §10-1080. . . ;" and (3) whether the trial court erred "by finding that the findings of fact are supported by substantial evidence and that there was no capricious disregard of competent, material evidence. . . ." (Purcell's brief at 4.)

11

## Discussion

To the extent that the present case involves questions of law under the School Code or the Pennsylvania Constitution, the standard of review is *de novo* and the scope of review is plenary. *Pennsylvania State Education Association ex rel. Wilson v. Commonwealth of Pennsylvania*, 50 A.3d 1263, 1270 (Pa. 2012).

Also, to the extent that the present case involves an interpretation of the employment agreement between the District and Purcell, the standard of review is *de novo* and the scope of review is plenary. *Currid v. Meeting House Restaurant, Inc.*, 869 A.2d 516, 518-19 (Pa. Super.), *appeal denied*, 882 A.2d 478 (Pa. 2005).

Finally, to the extent that the present case involves review of findings of fact, separate from any concerns about violations of the constitutional rights of Purcell or whether the trial court abused its discretion, the standard of review is whether the findings of fact adopted by the District and affirmed by the trial court in the absence of additional evidence were (1) supported by substantial competent evidence, and (2) not in capricious disregard of competent material evidence. *Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 812 A.2d 478, 487 (Pa. 2002).

## Due Process Rights

Purcell argues that the Board's combination of functions amounted to a deprivation of her due process rights. Specifically, she argues, when the Board serves as "indicters, prosecutors, witnesses-for-the-prosecution, credibility-determiners, and judges," this results *per se* in a process that is neither fair nor impartial. (Purcell brief at 13.) Purcell relies upon our Supreme Court's decision in *Lyness v. State Department of Medicine*, 605 A.2d 1204 (Pa. 1992). There, the lawyer for the State Board of Medicine investigated the allegations and presented them to the board for

disposition. Eight board members considered the evidence presented and decided to issue formal charges. The hearing was conducted by a hearing officer but the board conducted a *de novo* review and issued an adjudication. Three of the board members who participated in issuance of the charges also participated in the final adjudication, and two voted to suspend the physician's license. 605 A.2d at 1205-06.

This Court affirmed the board's revocation of a physician's license but the Supreme Court reversed, holding the board's process to have constituted "an unconstitutional intermingling of the prosecutorial and adjudicatory functions in a single entity." *Id.* at 1210. "What our [Pennsylvania] Constitution requires," reasoned the Supreme Court, "however, is that if more than one function is reposed in a single administrative entity, walls of division [must] be constructed which eliminate the threat or appearance of bias." *Id.* at 1209. The Supreme Court's concern was not any demonstration of actual bias; rather, "the potential for bias and the appearance of non-objectivity is sufficient to create a fatal defect under the Pennsylvania Constitution." *Id.* at 1210. Finally, the Supreme Court cited its decision in *Gardner v. Repasky*, 252 A.2d 704, 706 (Pa. 1969), when it noted proverbially, "A man cannot sit as judge when he is a member of a board which has brought the accusations." 605 A.2d at 1208.

Accordingly, argues Purcell, applying *Lyness* to the case at bar compels this Court to reverse the trial court's affirmation of the Board's adjudication because the Board "heard, defined, and issued the charges, as in *Lyness*, but [B]oard members were the chief, and sole substantive witnesses against [Purcell]." (Purcell's brief at 16.)

The District argues that Purcell's constitutional rights were observed; she had "sufficient process to protect her rights." (District's brief at 31.) The District distinguishes *Lyness* from the case at bar because Purcell had notice of the charges against her and a right to appeal from any adjudication. Moreover, the "simple

reality" is that due process in these settings has been modified by the School Code. (*Id.* at 34.) Indeed, the District cites the Supreme Court's decision in *Burger v. Board of School Directors of McGuffey School District*, 839 A.2d 1055, 1062 (Pa. 2003), for the proposition that "due process is a flexible concept." There, a superintendent was suspended without pay pending the convening of a formal hearing concerning the charges against him. The superintendent sought relief in *mandamus*, and received it in the trial court, which rescinded the suspension. This Court reversed, but was then reversed by the Supreme Court, which dealt solely with "interim suspensions with or without pay in appropriate circumstances in the face of allegations of serious misconduct on the part of a superintendent . . . ." *Id.* Accordingly, the Supreme Court did not reach the specific due process arguments about that school board's procedures. *Id.*

The Supreme Court did reach those concerns later in *Burger v. School Board of McGuffey School District*, 923 A.2d 1155 (Pa. 2007). By that time, the High Court was faced by a direct appeal from the trial court, which had held section 1080 of the School Code, 24 P.S. §10-1080, to have been unconstitutional and in violation of Article VI, section 7, of the Pennsylvania Constitution. 923 A.2d at 1157. The Supreme Court reversed, holding:

> It is undisputed that the office of school superintendent is not expressly provided for in our [Pennsylvania] Constitution; nor does the Constitution expressly prohibit the General Assembly from enacting provisions relating to school superintendents. The office is a statutory creation and, as such, Article VI, [s]ection 1 authorizes the General Assembly to enact provisions governing appointment and removal. Section 10-1080 [*sic*], therefore, plainly is constitutional. Moreover, . . . the reasons why the General Assembly would wish to establish a modicum of job security for this particular office are readily apparent, given the potential for conflict between superintendents and their school boards.

14

*Id.* at 1164. The Supreme Court then remanded the case to the trial court to consider the merits of the superintendent's claims under section 1080 of the School Code. *Id.* at 1165-66.

Further, the District argues that the present case is governed by *Horosko v. School District of Mt. Pleasant Township*, 6 A.2d 866 (Pa. 1939). There, a teacher worked at her husband's restaurant and bar, at which were pinball and slot machines, along with regular dice games. 6 A.2d at 868. The teacher was found to have demonstrated the gaming devices in front of school children, so that her firing was upheld by the Supreme Court. *Id.* at 869-70.

The District also argues that there is an inherent amount of commingling of functions in public school disciplinary proceedings, which have been recognized by this Court. *Stroudsburg Area School District v. Kelly*, 701 A.2d 1000, 1003 (Pa. Cmwlth. 1997). Thus, the District asserts, due process in this setting "is a continuum," citing a decision by this Court, *Harmon v. Mifflin County School District*, 651 A.2d 681, 685-86 (Pa. Cmwlth. 1994), which was later reversed at 713 A.2d 620 (Pa. 1998). The focus there was the invocation of Fifth Amendment[4] rights during questioning by school officials of a custodian. The trial court reversed the school board's termination of the custodian, and was in turn reversed by this Court at 651 A.2d 681. Upon remand, the trial court again reversed the school board and reinstated the custodian. Again, this Court reversed, at 684 A.2d 651 (Pa. Cmwlth. 1996). This Court found that invocation of the right against self-incrimination constituted substantial evidence of improper conduct. The Supreme Court reversed, calling for an "insistence upon the presence of independent, probative evidence to support an inference drawn when one invokes the protection of the Fifth Amendment

---

[4] U.S. Const. amend. V.

. . . ." 713 A.2d at 624-25. The Court concluded, "Difficulty of proof has never been allowed as an excuse for dispensing with it." *Id.* at 625 (citations omitted). The Supreme Court in *Harmon* confronted a much narrower issue than the issues in the present case, but in any event held solidly for due process of law rather than any "continuum" of processes.

Finally, the District argues that its actions complied "with the flexible concept of due process." (District's brief at 36.) The District appeals to what it styles as common sense when it asserts, "It would be incongruous with Pennsylvania statutory laws, reality, and public policy to require a school board to bring in an outside party any time that it sought to remove a district superintendent . . . ." *Id.* Such an "incongruity" is at the heart of the District's arguments.

In the present case, the trial court did not deal with a suspension pending final hearing and possible termination of a superintendent. Rather, the trial court reviewed an adjudication by the District which finalized the discharge of Purcell from her office. Our Supreme Court has dealt with an array of administrative proceedings in which due process has been challenged, in both the public school setting and in other arenas.

The modern concepts of administrative due process in Pennsylvania begin with *Lyness*. There, the Board of Medicine's decision was overturned because the Board's lawyer investigated the charges and also presented them to the Board for possible referral for discipline. Eight of the eleven Board members considered that preliminary evidence and voted to issue formal charges. Then the Board of Medicine as a whole conducted a hearing to consider the evidence, and subsequently adjudicated the case. 605 A.2d at 1206.

The Court left no doubt that "due process is fully applicable to adjudicative hearings involving substantial property rights . . . ." *Id.* at 1207 (citations omitted). Moreover, in setting the history of due process under the

16

Pennsylvania Constitution, the Court found roots in the Magna Charta, and noted that "when it comes to commingling prosecutorial and adjudicatory functions[,] [t]here is a strong notion under Pennsylvania law that even an *appearance* of bias and partiality must be viewed with deep skepticism." *Id.* (emphasis in original). The Supreme Court recognized the realities of a society that increasingly disposes of significant rights in administrative settings that may be more casual than formal judicial tribunals in the courts. Accordingly, the Court held, "What our [Pennsylvania] Constitution requires, however, is that if more than one function is reposed in a single administrative entity, walls of division be constructed which eliminate the threat or appearance of bias." *Id.* at 1209. Because the process before the Board of Medicine involved "unconstitutional intermingling of the prosecutorial and adjudicatory functions in a single entity" with no protective "constitutional buffer," the Board's decision was vacated and remanded. *Id.* at 1210-11.

Shortly after its decision in *Lyness*, our Supreme Court addressed an administrative proceeding that met the requirements of due process. In *Office of Disciplinary Counsel v. Duffield*, 644 A.2d 1186 (Pa. 1994), the individual was a lawyer facing disbarment and the agency was the Office of Disciplinary Counsel (ODC). The lawyer made allegations of violations of due process but his arguments were rejected by the High Court, which found that the system there involved: (1) the decision to file formal charges is made by ODC after approval by a reviewing member of the Hearing Committee of the Disciplinary Board; (2) that Disciplinary Board member has no further involvement in the case; (3) the case is assigned by the Secretary of the Disciplinary Board to a Hearing Committee, which acts as a trial court; (4) the actions of the Hearing Committee are then reviewed *de novo* by the Board as a whole; so that, (5) the Board does not become involved in the adjudication until the Hearing Committee files its report with the Secretary of the Disciplinary Board. The Court concluded, "This procedure does not involve commingling of

17

prosecutorial and adjudicative functions. Due process is therefore not violated." 644 A.2d at 1188. The Court reaffirmed *Lyness* as an accurate statement of law but found the lawyer's reliance on that case to have been "misplaced," specifically because the Disciplinary Board had in place the "walls of division" necessary to "eliminate the threat or appearance of bias." *Id*.

The District argues that *Lyness* has no applicability here, that Purcell has no case so long as she received "sufficient due process," which the District identifies as notice coupled with "full and complete appellate options through her contract and state law . . . ." (District's brief at 31.) In support of its arguments, the District cites *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), which recognized that "either the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Parratt*, however, was focused on state action in a civil rights claim brought by a prisoner, and did not have to do with the increasingly active administrative branches of government, at the local, state, or national levels. Moreover, there was in the present case no "necessity of quick action" by the District, which stretched out the process, taking over nine months from the first letter to Purcell until the November 26, 2013, hearing. *Parratt* has nothing to do with the facts of the present case.

Indeed, the present case is more similar to what this Court addressed in *Department of Education v. Oxford Schools*, 356 A.2d 857 (Pa. Cmwlth. 1976). There, the superintendent testified against a teacher in a disciplinary hearing, and then participated in the school board's deliberations. This Court held that although the superintendent could have performed either one of the functions, it was improper for him to wear both hats. *Id.* at 861.

18

There is no ground of either precedent or reason for this Court to fail to apply the mandate of *Lyness* and its progeny to the case at bar. "Sufficient process" is argued by the District but what really occurred was deficient process, or no due process at all. Purcell does not need to prove a stacked deck to prevail; rather, all she needs to establish is that the District's process was infected with "the appearance of non-objectivity." *Lyness*, 605 A.2d at 1210. The charges originated within the Board as opposed to originating with the public, the faculty, the parents, or the students. Once the hearings occurred, the same Board members who initiated the charges, testified about the charges. Once the hearings closed, the same Board members voted to terminate Purcell.

There were no "walls of division" that are required if a public entity wants to discipline or fire a professional employee, especially one protected by the School Code. *Id.* at 1209. Here, the District did not even pretend there was anything to prevent the egregious commingling of investigative and adjudicatory functions; although due process seems "incongruous" to the District, it remains the law of this Commonwealth.

### Sufficiency of Reasons for Termination

In her second and third arguments, Purcell essentially contends that the District's charges are so picayune that they fail to warrant dismissal based on any one charge or even altogether. Referring to the charges as "trumped-up allegations," Purcell cites *Antonini v. Western Beaver School District*, 874 A.2d 679 (Pa. Cmwlth. 2005). (Purcell brief at 28.) In *Antonini*, a superintendent was suspended pending the filing of formal charges and the convening of a hearing. The superintendent sought *mandamus* relief after he was suspended with pay for lack of progress in

19

construction of a handicap-access restroom, transfer of Title I[5] funds from one defined purpose to another defined purpose, the amount of Title I funds used to reimburse teachers, and inadequate notice to school board members before interviews of prospective employees. 874 A.2d at 680-81. The trial court concluded that none of the allegations constituted "serious misconduct" that would excuse compliance with section 1080 of the School Code. On appeal, this Court affirmed the trial court, holding that the charges were not "serious" within the guidelines of our Supreme Court in *Burger*, 839 A.2d at 1061. This was so, concluded this Court in *Antonini*, because "the conduct does not immediately threaten the public trust." 874 A.2d at 684-85.

The present case, argues Purcell, consists of allegations of similarly vague concerns which, even if true, do not rise to the level of "misconduct," serious or otherwise.

The District argues that because of the few precedential cases in Pennsylvania regarding discipline of superintendents, that teacher discipline cases should be applied where the holdings fit the four grounds for removal from office set forth in section 1080 of the School Code, namely, neglect of duty, incompetency, intemperance, or immorality. The District argues that "immorality" reflects the "morals of the community." (District's brief at 40.) Accordingly, Charge 11 (requests for mileage after July 1, 2012, and vacation days and car allowance prior to that date), according to the District, amounted to immorality because it was akin to theft.

The remaining charges (except for Charges 9 and 13, which were withdrawn) fall under both "incompetency" and "neglect of duties," the District argues. The District's charges in these categories under section 1080 can be classed

20

into three groups: (1) allegations of personal shortcomings, such as Charge 3 (failure to submit leave requests to the Board secretary), Charge 4 (failure to submit self-evaluation on time), Charge 5 (failure to investigate conduct of a building principal in a timely manner), Charge 10 (unsatisfactory rating and a failure to meet performance goals), and Charge 12 (failure to complete an organizational chart); (2) allegations concerning the budget process, such as Charge 2 (embarrassing the Board and laid off employees when Purcell publicly said she would find funds to keep the communications director), Charge 6 (providing false information to the Board regarding the Food Services part of the budget), Charge 7 (failure to follow the Board's directive to balance the budget and submit it to the Pennsylvania Department of Education on time), and Charge 8 (failure to supervise and/or discipline the Director of Finance for his conduct during the budget process); and, (3) general allegations of misconduct, such as Charge 1(a) (extending contracts for outside speakers at a leadership retreat) and Charge 1(b) (failure to staff all buildings with principals in advance of the school year).

Purcell contends that the charges are false but, even if true, fall squarely within the definition of actions or omissions which are not misconduct under *Antonini* (which found for the superintendent) or even *Horosko* (which found against the teacher).

The District replies that the charges seriously call into question Purcell's conduct under three of the four specified grounds in section 1080, but of critical importance to the District was the alleged conduct during the budget process, which has become more cumbersome, complicated, and time-driven as the result of recent legislative mandates on local school districts, the boards of which (unpaid volunteers) increasingly count on administrative personnel to craft the budgets that fund public education in the Commonwealth.

21

The allegations of personal shortcomings (Charges 3, 4, 5, 10, and 12), even if true, appear to lack any support under any of the four factors set forth in section 1080 as grounds for termination.

Charge 6 (allegations of providing false information to the Board regarding the food services contract), appears to have some evidence to support it but lacks specific testimony or evidence apart from testimony of present or past Board members.

Charges 7 and 8 are where the ground is muddied, namely, who had responsibility for what during the budget process. The District points to how the whole budget process has changed for public schools in Pennsylvania because of changes in what the Legislature now requires to pass a timely budget. Purcell points to vacillation and contradictory votes and statements by the Board during the budget process. Whether the District or Purcell is correct, the matter should be remanded for specific findings regarding who had responsibility for what, and when tasks should have been completed, including not just the budget process generally but also responsibility for the comments of the finance director.

Regarding the other charges before the Court, Charges 1(a), 1(b), 2, and 11 do not appear to have competent evidence to support them.

**Conclusion**

The impermissible commingling of functions by the Board raises serious constitutional concerns relating to the required due process in administrative proceedings.

Accordingly, this Court reverses in part the decision and order of the trial court insofar as it affirmed the District's termination of Purcell as to Charges 1(a), 1(b), 2, 3, 4, 5, 6, 10, 11, and 12, and vacates the District's termination in part as to Charges 7 and 8. The matter is remanded to the trial court, with specific direction

22

to remand to the Board, to conduct a due process hearing consistent with the Pennsylvania Constitution as amplified by *Lyness*, on the sole issues of Charges 7 and 8, relating to the budgetary process for the District.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. Carlinda Purcell,              :
            Appellant       :
                             :    No. 1164 C.D. 2016
          v.                 :
                             :
Reading School District      :

## ***ORDER***

AND NOW, this 14th day of July, 2017, the order of the Court of Common Pleas of Berks County (trial court), dated June 21, 2016, is reversed insofar as it affirmed the Reading School District's (District) termination of Purcell concerning Charges 1(a), 1(b), 2, 3, 4, 5, 6, 10, 11, and 12. The order of the trial court is vacated insofar as it affirmed the District's termination of Purcell concerning Charges 7 and 8. The matter is remanded to the trial court, with specific direction to remand to the Board, to conduct a due process hearing consistent with the Pennsylvania Constitution as amplified by *Lyness v. State Department of Medicine*, 605 A.2d 1204 (Pa. 1992), on the sole issues of Charges Nos. 7 and 8.

Jurisdiction is relinquished.

_____
PATRICIA A. McCULLOUGH, Judge