IN THE COMMONWEALTH COURT OF PENNSYLVANIA

James W. Temple,                          :
                        Petitioner         :
                                           :
            v.                             :    No.  693 C.D. 2021
                                           :    Submitted:  May 6, 2022
Bureau of Professional                     :
and Occupational Affairs,                  :
State Board of Veterinary Medicine,        :
                        Respondent         :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                              FILED:  August 5, 2022


        James W. Temple, DVM (Petitioner), petitions for review of the May 26, 2021
order of the State Board of Veterinary Medicine (Board), which found that Petitioner
failed to conform to the standards of acceptable and prevailing veterinary medical
practice pursuant to Section 21(11) of the Veterinary Medicine Practice Act (Act).[1]
Petitioner contends that the expert testimony presented against him violated his right
to due process by creating the appearance that the Board intermingled prosecutorial
and adjudicatory functions, and that substantial competent evidence did not support
the Board's findings of fact because that same expert testimony was incompetent.
After review, we affirm in part, vacate in part, and remand.

---

[1] Act of December 27, 1974, P.L. 995, *as amended*, 63 P.S. § 485.21(11).

## I. Background and Procedural History

This proceeding stems from Petitioner's practice as a veterinarian at Sunbury Animal Hospital (the Hospital) in Sunbury, Pennsylvania. On February 18, 2016, Donna Kurtz (Owner) brought her dog, Tiki, to the Hospital for an emergency visit, where Petitioner performed an examination. Reproduced Record (R.R.) at 74a-76a. The record contains differing accounts of Tiki's symptoms that day, both of which the Board appears to have relied upon when reaching its decision. According to Owner's testimony, she informed Petitioner that Tiki was making "hacking" sounds and having difficulty breathing. *Id.* at 74a-75a. Tiki also vomited on the car ride to the Hospital, although this was "common" because of Tiki's motion sickness. *Id.* at 76a. According to the notes in Tiki's medical records, Owner reported Tiki had been "trying to throw up" since early that morning, was "heaving [and] vomiting froth," could "hardly walk," was very lethargic, and had been having trouble breathing since the night before. *Id.* at 346a. Petitioner's examination revealed increased respiratory sounds over Tiki's trachea and bronchi. *Id.* He then proposed Tiki may be suffering from canine flu. *Id.* at 76a. Owner requested that Tiki receive X-rays and blood tests, but Petitioner declined, saying he did not "feel that it was needed." *Id.* at 77a. Petitioner prescribed amoxicillin and carpaquin for Tiki but took no other action. *Id.* at 77a-78a.

Owner administered the medications as prescribed. *Id.* at 78a. Nonetheless, Tiki's condition deteriorated. *Id.* at 78a-79a. It became harder for Tiki to breathe, and she began making what Owner described as a "death rattle . . . like a noisy breath, and she would fight for that." *Id.* On February 21, 2016, Owner called the Hospital. *Id.* at 79a. Staff at the Hospital advised Owner to obtain a vaporizer for Tiki, and

2

Owner complied. *Id.* The vaporizer helped Tiki's breathing to improve only briefly, "for maybe a half hour, 45 minutes," but it then deteriorated once again. *Id.*

Owner brought Tiki back to the Hospital on February 22, 2016, for a second emergency visit. *Id.* at 79a-80a. This time, a different veterinarian examined Tiki. *Id.* at 223a-24a. Tiki had trouble breathing during the examination, and a lump was present on the left side of her body. *Id.* at 83a, 220a. Staff at the Hospital performed X-rays, which revealed severe pleural effusion.[2] *Id.* at 81a, 227a. Tiki remained at the Hospital from February 22, 2016, onward, and never returned to Owner's home. *Id.* at 81a-82a. Because of limited medical options, Owner chose to euthanize Tiki on February 27, 2016. *Id.* at 82a, 366a-73a.

On September 19, 2019, a prosecuting attorney from the Department of State (Department) issued an order to show cause against Petitioner, alleging that he failed to maintain proper veterinary medical records. The order also alleged that Petitioner failed to conform to the standards of acceptable and prevailing veterinary medical practice by not thoroughly evaluating Tiki, misdiagnosing her condition, prescribing inappropriate medications, and not offering to perform X-rays. Petitioner filed an answer. The Board delegated the case to a hearing examiner from the Department's Office of Hearing Examiners, and a hearing occurred on August 14, 2020. Petitioner participated in the hearing with counsel. The hearing examiner heard testimony from Lance Budinger, a professional conduct investigator from the Department's Bureau of Enforcement and Investigation; Owner; the Department's expert witness, Brian V. Harpster, DVM (Harpster); Petitioner; Erin Bourinski, a certified veterinary

---

[2] The expert testimony in this case defined "pleural effusion" as "fluid in the lung cavity and also the chest cavity, and it's also within the lung tissue" or as "fluid outside the lung cavity . . . ." R.R. at 132a, 275a.

3

technician at the Hospital; and Petitioner's expert witness, Jerry Alan Greene, DVM (Greene).

In relevant part, the Department presented testimony from Harpster regarding his qualifications as an expert witness. Harpster explained that he previously served on the Board for eight years and was its chairman for six of those years. *Id.* at 95a. Harpster's *curriculum vitae* indicates that he served on the Board from 1997 to 2006 and was its chairman from 2000 to 2006. *Id.* at 382a. Harpster testified that he later began working as a consultant and expert witness. *Id.* at 94a. Harpster stated that he had "been doing consulting work for the . . . Board . . . with regards to complaints that have been filed with the [B]oard." *Id.* at 95a. Petitioner's counsel moved to disqualify Harpster, arguing that his testimony was an "impermissible co-mingling of prosecutory and adjudicatory functions of the Board." *Id.* at 99a. The hearing examiner deferred his ruling so that the Department's counsel could ask Harpster follow-up questions. *Id.* at 100a. During the questioning, Harpster clarified that he works with prosecutors and not the Board itself, that he does not interact with Board members, and that Board members do not ask him to review cases for them. *Id.* at 100a-01a. Given this explanation, the hearing examiner denied Petitioner's request to disqualify Harpster. *Id.* at 103a.

The Department then presented Harpster's expert opinion that Petitioner fell below the standards of acceptable and prevailing veterinary medical practice in his care of Tiki on February 18, 2016. *Id.* at 110a. Harpster testified that the standard of care in "this type of case, respiratory" required Petitioner to obtain a thorough history of Tiki's symptoms and "not really rely on notes of the technician and the owner." *Id.* at 113a. Harpster noted that, although the Hospital's receptionist or technician took a history, he did not see any indication in the medical records that

4

Petitioner had asked questions or took notes regarding Tiki's history himself. *Id.* at 113a-14a, 120a-21a, 139a. Harpster also testified that the standard of care required Petitioner to thoroughly evaluate Tiki's respiratory tract, including her lungs. *Id.* at 114a. Harpster explained he did not see any indication in the medical records that Petitioner had evaluated Tiki's lungs. *Id.* at 114a, 122a-23a, 137a. In "respiratory distress" cases, Harpster added, the standard of care required Petitioner to perform X-rays and blood tests, neither of which Petitioner did. *Id.* at 114a, 148a-49a.

Petitioner sought to rebut Harpster's testimony with Greene's contrary expert opinion that Petitioner's treatment did not fall below the standard of care. *Id.* at 261a. Greene observed that Tiki's medical records described her general appearance on February 18, 2016, as "normal," but indicated that her respiratory system was "abnormal" in that Petitioner noted increased sounds over her trachea and bronchi. *Id.* at 268a-69a, 279a-81a. Greene faulted Harpster for placing too much emphasis on Owner's subjective reports of Tiki's symptoms rather than these objective results of Petitioner's examination. *Id.* at 279a-81a. Greene further challenged Harpster's assertion that Petitioner failed to evaluate Tiki's lungs, explaining that Petitioner noted increased sounds over her bronchi, which are "[w]ithin the lung parenchyma themselves." *Id.* at 268a, 286a. With respect to the standard of care, Greene opined that it required Petitioner to examine Tiki, determine a presumptive diagnosis, and develop a treatment plan, which is what Petitioner did. *Id.* at 271a. Greene further opined it was not necessary for Petitioner to perform X-rays and blood tests because "the signs and symptoms that were being shown were not that severe, and it basically did not require any type of invasive workup." *Id.* at 277a, 303a-04a.

On January 15, 2021, the hearing examiner issued his proposed adjudication and order. The hearing examiner concluded that Petitioner had not failed to maintain

proper veterinary medical records, but that his care of Tiki on February 18, 2016, fell below the standards of acceptable and prevailing veterinary medical practice because he failed to order X-rays and blood tests. The hearing examiner's proposed order reprimanded Petitioner, directed him to pay a civil penalty of $1,000, directed him to pay costs of $2,360.09, and required him to complete at least three hours of continuing education in veterinary diagnosis and treatment related to respiratory and lung disease.

Petitioner filed a brief on exceptions to the proposed adjudication and order, and the Department filed a brief in opposition. On May 26, 2021, the Board issued a final memorandum order adopting the hearing officer's proposed adjudication and order. The Board rejected Petitioner's claim on exceptions that the hearing examiner should have disqualified Harpster because of the appearance his testimony resulted in intermingled prosecutorial and adjudicatory functions. The Board explained that separate entities handled the prosecutorial and adjudicatory functions in the matter, and that there was nothing in the record to suggest bias, prejudice, or unfairness. *Id.* at 581a.[3] A hearing examiner, rather than the Board, held the evidentiary hearing. *Id.* at 577a. Although Harpster was a past member and chairman of the Board, at the time he provided consulting services to Department prosecutors, he did not have contact with Board members. *Id.* at 581a. In addition, the Board accepted Harpster's testimony and concluded that the standard of care required Petitioner to recommend X-rays and blood tests for Tiki. *Id.* at 579a. It rejected Greene's contrary testimony, reasoning that his description of the standard of care was overly subjective. *Id.* at 578a. The Board explained, "[w]hile the standard must remain flexible so that it can

---

[3] Several pages of the final memorandum order are without page numbers in the reproduced record. We have supplied the missing page numbers for the purposes of our citations.

evolve and progress with advancements in veterinary medicine, an objective minimum standard of care must remain." *Id.*

Petitioner filed a petition for review and now presents two arguments, which we have reordered for our disposition. Petitioner contends (1) that Harpster's testimony created the appearance that the Board intermingled prosecutorial and adjudicatory functions in violation of Petitioner's right to due process, and (2) that substantial competent evidence did not support the Board's findings regarding his failure to conform to the standards of acceptable and prevailing veterinary medical practice because Harpster's expert opinion was incompetent.

## II. Discussion

We review the Board's order for violations of the petitioner's constitutional rights, violations of agency practice and procedure, and other legal errors. 2 Pa.C.S. § 704. Further, we review whether substantial evidence supports the findings of fact necessary to sustain the Board's decision. *Id.* "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Hammad v. Bureau of Pro. & Occupational Affs., State Bd. of Veterinary Med.*, 124 A.3d 374, 380 n.7 (Pa. Cmwlth. 2015) (citing *Shrader v. Bureau of Pro. & Occupational Affs., State Bd. of Veterinary Med.*, 673 A.2d 1, 2 (Pa. Cmwlth. 1995)). Although the witnesses in this matter testified before a hearing examiner, the Board is the ultimate factfinder and determines credibility. *Id.* at 381 n.11 (quoting *A.O. v. Dep't of Pub. Welfare*, 838 A.2d 35, 38 n.5 (Pa. Cmwlth. 2015)). Upon review of the hearing examiner's proposed order, the Board may hold an additional hearing, make new factual findings, alter the hearing officer's recommended sanctions, reject the proposed order in its entirety, or adopt the proposed order without alteration. *Id.* at 381.

Initially, Petitioner contends that Harpster's testimony created the appearance that the Board intermingled prosecutorial and adjudicatory functions in violation of Petitioner's right to due process. Petitioner asserts that the hearing examiner erred by failing to disqualify Harpster, and that the Board erred by relying on Harpster's testimony. Pet'r's Br. at 31. Petitioner emphasizes that Harpster is a previous member and chairman of the Board, and that Harpster testified he is under contract with, and does consulting work for, the Board. *Id.* at 32-33. Petitioner directs our attention to *Lyness v. State Board of Medicine*, 605 A.2d 1204 (Pa. 1992), and *Purcell v. Reading School District*, 167 A.3d 216 (Pa. Cmwlth. 2017).

In *Lyness*, the State Board of Medicine revoked a doctor's license because of his alleged sexual molestation of patients. 605 A.2d at 1204-06. Our Supreme Court concluded that there had been an impermissible intermingling of prosecutorial and adjudicatory functions, which violated the doctor's right to due process. *Id.* at 1209-10. The Court reasoned that the State Board of Medicine investigated and chose to prosecute the doctor, and then presided over his prosecution. *Id.* at 1205-06. Indeed, of the seven members of the Board who voted to prosecute the doctor, three later participated in the meeting at which the Board revoked the doctor's license, and two voted in favor of revocation. *Id.* The Court explained that the "mere possibility of bias under Pennsylvania law is sufficient to raise the red flag of protection offered by the procedural guaranty of due process." *Id.* at 1208. Despite this, the Court noted it was "unrealistic and counterproductive" to prohibit administrative agencies from serving in both prosecutorial and adjudicatory roles, "where such roles are parcelled out and divided among distinct departments or boards." *Id.* at 1209. The Court clarified, "[w]hat our Constitution requires . . . is that if more than one function

8

is reposed in a single administrative entity, walls of division be constructed which eliminate the threat or appearance of bias." *Id.*

Similarly, *Purcell* involved the termination of a school district superintendent, where the school board initiated disciplinary proceedings against the superintendent, members of the school board testified against the superintendent at her hearing, and the school board then made the initial decision to terminate the superintendent. 167 A.3d at 217-22. Citing *Lyness*, the superintendent argued that the school board's combination of roles violated her right to due process. *Id.* at 223. This Court agreed, pointing to the absence of "walls of division" and the "egregious" intermingling of functions. *Id.* at 226 (quoting *Lyness*, 605 A.2d at 1209). We explained, "[t]here is no ground of either precedent or reason for this Court to fail to apply the mandate of *Lyness* and its progeny to the case at bar. 'Sufficient process' is argued by the [school d]istrict but what really occurred was deficient process, or no due process at all." *Id.*

The cases Petitioner cites are distinguishable from the matter at bar. Although the Department performed each role in Petitioner's disciplinary proceeding, the roles were divided among distinct organizations within the Department. *Lyness*, 605 A.2d at 1209. The Department's Bureau of Enforcement and Investigation investigated the case. A prosecuting attorney from the Department issued the order to show cause and presented evidence against Petitioner during the hearing. A hearing examiner from the Department's Office of Hearing Examiners presided over the hearing and issued a proposed adjudication and order. Finally, the Board, which is also part of the Department, served as the ultimate factfinder and issued the final memorandum order. We are satisfied these "walls of division" eliminated the threat or appearance of bias. *Id.*

9

Regarding Harpster specifically, it is true that his initial testimony suggested he worked for the Board. Harpster explained that he served on the Board for eight years and was chairman for six of those years. R.R. at 95a. Harpster's *curriculum vitae* indicates he served on the Board from 1997 to 2006 and was its chairman from 2000 to 2006. *Id.* at 382a. Harpster then began working as a consultant and expert witness. *Id.* at 94a-95a, 104a. Harpster explained he had "been doing consulting work for the . . . Board . . . with regards to complaints that have been filed with the [B]oard." *Id.* at 95a. The Department's counsel asked Harpster follow-up questions, however, during which he clarified that he works with prosecutors and not the Board itself, that he does not interact with Board members, and that Board members do not ask him to review matters for them. *Id.* at 100a-01a. Given that Harpster had not been a member of the Board for approximately 14 years at the time of this proceeding and given his testimony that he works with prosecutors and not Board members, we discern no violation of Petitioner's right to due process resulting from Harpster's testimony. *See Stone and Edwards Ins. Agency, Inc. v. Dep't of Ins.*, 648 A.2d 304, 307-08 (Pa. 1994) (explaining that the appearance of bias, partiality, or prejudice *Lyness* proscribes "must clearly be one that arises from an actual environment of commingled functions. . . . In the absence of any actual commingling . . . due process guarantees are being adequately protected") (emphasis omitted).

Petitioner next contends that substantial competent evidence did not support the Board's finding that his care of Tiki fell below the standards of acceptable and prevailing veterinary medical practice. Petitioner focuses this claim on challenging Harpster's expert report. In his report, Harpster presented various "areas of concern" with Petitioner's care of Tiki on February 18, 2016. R.R. at 379a-80a. Petitioner now endeavors to challenge these areas as inconsistent with the record evidence or

10

Harpster's own testimony at the hearing. Pet'r's Br. at 24-30. Petitioner also separately challenges the proposition that he should have recommended blood tests for Tiki, arguing that the Department did not raise the issue of blood tests in its order to show cause, among other things. *Id.* at 30-31. Petitioner asserts that the Board's decision relied on Harpster's opinion, but that Harpster's opinion was incompetent, such that the Board's decision lacked sufficient evidentiary support. *Id.* at 20-31, 34-35.

The Department alleged in its order to show cause, and the Board found, that Petitioner violated Section 21(11) of the Act. Section 21(11) provides for imposition of discipline due to "[i]ncompetence, gross negligence or other malpractice, or the departure from, or failure to conform to, the standards of acceptable and prevailing veterinary medical practice, in which case actual injury need not be established." 63 P.S. § 485.21(11). Importantly, while the Board is comprised of individuals with specialized expertise in veterinary medicine, this expertise cannot take the place of expert testimony. *See Yi v. State Bd. of Veterinary Med.*, 960 A.2d 864, 869-72 (Pa. Cmwlth. 2008). The Board may use its expertise to "filter" evidence by resolving conflicts in testimony and drawing reasonable inferences, but substantial evidence must still support the Board's findings of fact. *Id.* at 871-72 (citing *Batoff v. State Bd. of Psych.*, 750 A.2d 835, 840 (Pa. 2000)).

Whether an expert's testimony is competent presents a question of law subject to our plenary review. *City of Philadelphia v. Workers' Comp. Appeal Bd. (Kriebel)*, 29 A.3d 762, 769 (Pa. 2011) (citing *Lewis v. Workmen's Comp. Appeal Bd.*, 498 A.2d 800, 803 (Pa. 1985)). We have observed that an expert may not base his or her opinion on mere conjecture. *Id.* at 770 (quoting *Collins v. Hand*, 246 A.2d 398, 404 (Pa. 1968)). "[E]xpert testimony is incompetent if it lacks an adequate basis in fact.

. . . [A]n expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence." *Kimberly Clark Corp. v. Workers' Comp. Appeal Bd. (Bromley)*, 161 A.3d 446, 467 (Pa. Cmwlth. 2017) (quoting *Gillingham v. Consol Energy, Inc.*, 51 A.3d 841, 849 (Pa. Super. 2012)) (emphasis omitted).

The Board's sole reasons for imposing discipline against Petitioner were his failure to recommend X-rays and blood tests. R.R. at 578a-79a. There was a clear factual basis for this aspect of Harpster's opinion.[4] Owner testified she informed Petitioner that Tiki was making "hacking" sounds, was having difficulty breathing, and vomited on the car ride to the Hospital. *Id.* at 74a-76a. Notes in the medical records indicate that Owner reported Tiki had been "trying to throw up" since early that morning, was "heaving [and] vomiting froth," could "hardly walk," was very lethargic, and had been having trouble breathing since the night before. *Id.* at 346a. Petitioner's examination revealed increased respiratory sounds over Tiki's trachea and bronchi. *Id.* Given this evidence, Harpster was not acting on mere conjecture when he characterized this as a "respiratory distress" case and opined that the standard of care required further testing in the form of X-rays and blood tests. *Id.* at 114a; *see also City of Philadelphia*, 29 A.3d at 769. Harpster's testimony was plainly competent.[5]

---

[4] Petitioner is correct that certain aspects of Harpster's report were inconsistent with his testimony during the hearing. Nevertheless, the Board did not find against Petitioner regarding these areas of inconsistency. *See Degraw v. Workers' Comp. Appeal Bd. (Redner's Mkts., Inc.)*, 926 A.2d 997, 1001 (Pa. Cmwlth. 2007) ("The opinion of a medical expert must be viewed as a whole. A medical expert's opinion is rendered incompetent only if it is based solely on inaccurate or false information.") (citations omitted).

[5] Contrary to Petitioner's contention, Harpster rendered his opinions regarding both X-rays and blood testing within a reasonable degree of veterinary certainty. R.R. at 114a-15a.

This does not end our discussion, however. Petitioner also maintains that the Board disciplined him for failing to recommend blood tests for Tiki when the order to show cause did not include blood tests as a basis for discipline. Pet'r's Br. at 31. *See LT Int'l Beauty Sch. v. Bureau of Pro. & Occupational Affs., State Bd. of Cosmetology,* 13 A.3d 1004, 1013 (Pa. Cmwlth. 2011) (citing *Gombach v. Dep't of State, Bureau of Comm'ns, Elections & Legis.*, 692 A.2d 1127, 1130 (Pa. Cmwlth. 1997)) ("Adequate notice for procedural due process purposes requires, at a minimum, that the notice contain a sufficient listing and explanation of the charges against a person, so that he or she may prepare an adequate defense."). We addressed a similar issue in *Yi*. That case involved a veterinarian's treatment of a dog's fractured and gangrenous leg. 960 A.2d at 866. This Court explained, in relevant part, that the order to show cause alleged the veterinarian improperly failed to repair the dog's leg by surgery and did not refer the dog to a surgeon. *Id.* at 875-76. The Board then found that the veterinarian improperly splinted the dog's leg, although the order to show cause never alleged improper splinting. *Id.* at 876-78. We reasoned that substantial evidence did not support the Board's findings, and that, because the order to show cause did not put the veterinarian on notice that his manner of splinting the dog's leg would be at issue, "the Board was not free to enlarge the scope of the hearing in this way." *Id.* at 878.

Similarly, our review demonstrates that Petitioner was not on notice that his failure to recommend blood tests for Tiki would be at issue in this case. The order to show cause did not aver that Petitioner fell below the standards of acceptable and prevailing veterinary medical practice by failing to recommend blood tests. The order faulted Petitioner for his alleged failure to properly maintain medical records, inadequate evaluation of Tiki, misdiagnosis of her condition, failure to offer X-rays,

13

and prescription of inappropriate medication. Before the hearing, Petitioner filed an answer to the order to show cause, which included a "motion for allegations to be made more definite and certain." R.R. at 16a. The hearing examiner issued an order, which granted the motion in part by directing that the Department provide Petitioner with its expert report. Harpster's report, like the order to show cause, did not fault Petitioner for his failure to recommend blood tests but focused instead on medical records, X-rays, and prescriptions. Harpster also maintained that Petitioner failed to recognize the severity of Tiki's condition and misdiagnosed that condition. Despite this, the Board found Petitioner fell below the standard of care by failing to recommend blood tests. Given this Court's decision in *Yi*, the Board should not have "enlarge[d] the scope" of Petitioner's disciplinary proceeding in this way. 960 A.2d at 878.

The record confirms, therefore, that substantial competent evidence supports only the Board's finding that Petitioner violated Section 21(11) of the Act by failing to recommend X-rays for Tiki. Although the Board should not have found a violation of Section 21(11) based on Petitioner's failure to recommend blood tests, this does not mean we must disturb the Board's Section 21(11) determination. Section 21(11) provides for the imposition of discipline if a veterinarian falls below the standards of acceptable and prevailing veterinary medical practice, and Petitioner's failure to recommend X-rays alone is sufficient to support the Board's decision. Nevertheless, because the Board relied on the failure to recommend blood tests when imposing sanctions on Petitioner, we vacate the sanctions provision of the Board's order and remand for the imposition of sanctions without considering Petitioner's failure to recommend blood tests. *See Kahn v. State Bd. of Auctioneer Exam'rs*, 785 A.2d 512, 514-18 (Pa. Cmwlth. 2001) (vacating and remanding "for a

14

determination of sanctions based only upon the disciplinary action imposed by Maine," where the State Board of Auctioneer Examiners penalized Kahn for disciplinary actions against him in Maine and Virginia, but where Kahn did not admit guilt and was not found guilty in Virginia).

### III. Conclusion

Based on the foregoing, we conclude Harpster's testimony did not create the appearance that the Board intermingled prosecutorial and adjudicatory functions in violation of Petitioner's right to due process. We further conclude that Harpster's testimony was competent, and that substantial competent evidence supported the Board's finding that Petitioner fell below the standards of acceptable and prevailing veterinary medical practice by failing to recommend X-rays for Tiki on February 18, 2016. Accordingly, we affirm the portion of the Board's final memorandum order finding Petitioner violated Section 21(11) of the Act.

The substantial evidence rule exists to allow a party facing a disciplinary proceeding, including Petitioner, an opportunity to mount a defense to facilitate a fair administrative hearing. Because the Board improperly found that Petitioner violated Section 21(11) by failing to recommend blood tests for Tiki when Petitioner had no prior notice that blood tests would be at issue in the proceeding, and because the Board relied on the failure to recommend blood tests when it sanctioned Petitioner, we vacate the sanctions provision of the final memorandum order and remand for the imposition of sanctions without taking the failure to recommend blood tests into consideration.

_____
STACY WALLACE, Judge

15

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

James W. Temple,           :
        Petitioner     :
                         :
       v.              :   No.  693 C.D. 2021
                         :
Bureau of Professional     :
and Occupational Affairs,   :
State Board of Veterinary Medicine,  :
        Respondent   :

# O R D E R

**AND NOW**, this 5th day of August, 2022, the May 26, 2021 order of the State Board of Veterinary Medicine is **AFFIRMED IN PART** and **VACATED IN PART**. The portion of the order finding that Petitioner, James W. Temple, DVM, violated Section 21(11) of the Veterinary Medicine Practice Act[1] is **AFFIRMED**, while the portion of the order imposing sanctions against Petitioner is **VACATED**. The matter is **REMANDED** for the imposition of sanctions without consideration of Petitioner's failure to recommend blood tests.

     Jurisdiction relinquished.

_____
STACY WALLACE, Judge

---

[1] Act of December 27, 1974, P.L. 995, *as amended*, 63 P.S. § 485.21(11).